Kenneth DOMKE, Appellant,

v.

ALYESKA PIPELINE SERVICE CO., INC., Champion Technologies Inc., Larry (Lawrence) Disbrow, and Matt (Matthew) Knickrehm, Appellees.

No. S–10885.

Supreme Court of Alaska.

June 16, 2006.

Rehearing Denied July 26, 2006.

Arthur S. Robinson and Eric Derleth, Robinson & Associates, Soldotna, for Appellant.

Cynthia L. Ducey, Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc., Anchorage, for Appellees.

Before: BRYNER, Chief Justice, MATTHEWS, FABE, and CARPENETI, Justices.

*OPINION*

BRYNER, Chief Justice.

## I. INTRODUCTION

In this appeal from a judgment on his claims for wrongful termination as an employee of Champion Technologies, Inc., Kenneth Domke seeks a new trial on damages, disputes the superior court's rulings on issues involving vicarious liability and allocation of fault, and challenges the jury's award on the defendants' counterclaims for conversion and unjust enrichment. We vacate the judgment in part and remand for entry of a modified judgment, holding that Domke's motion for a judgment notwithstanding the verdict as to vicarious liability should have been granted; that further proceedings are necessary to determine whether Champion's counterclaims are time-barred; and that the jury should not have been allowed to allocate fault to Domke on his claims for tortious interference with his employment contract.

## II. FACTS AND PROCEEDINGS

In March 1997, Champion Technologies, Inc., hired Kenneth Domke as a consultant "to advise ... Champion personnel ... with the objective of selling Champion's chemical products to oil, gas, pipeline and refinery operators." That October, Champion offered Domke at-will employment as project manager on BPO–213, a contract between Champion and Alyeska Pipeline Service Co., Inc., under which Champion provided corrosion inhibitors and engineering services for the Trans–Alaska Pipeline. Domke accepted this position.

Although his salary and position had changed, an accounting error resulted in Domke receiving five additional paychecks from his original consulting position, covering the period from November 21 to March 18,

1998. Domke deposited four of the five overpayments, returning the last.

Alyeska's steward for BPO–213 was Larry Disbrow, a senior corrosion engineer. Dealings between Disbrow and Domke quickly soured. Domke claimed that Disbrow falsified a corrosion report and, when Domke refused to sign the report, retaliated by "aggressively directing Domke's day-to-day work, assigning Domke impossible tasks, and bec[oming] angry on occasion, all of which became more frequent as time went on." But according to Alyeska, Domke was uncooperative, routinely missed work, and threatened to sue Disbrow for violating Alyeska's internal co-employment policy whenever Disbrow requested his help on contract-related tasks.

In the summer of 1998, at least in part because of Domke and Disbrow's deteriorating relationship, Domke was demoted from his position as project manager by Matt Knickrehm, his Champion supervisor. On October 1 Disbrow sent Knickrehm an e-mail stating "Ken Domke and I have experienced a number of what I would categorize[ ] as communications problems." Disbrow went on to say:

> In the best interest of the corrosion inhibitor program and our working relationship, I think that Champion should [e]ffect a change. Because of the coemployment issue, I cannot tell you what change to make. I hope that you can make a change that will improve the working relationship between myself, as the Alyeska steward of the Champion contract, and Champion Technologies, Inc.

Knickrehm interpreted this as a request to remove Domke from the BPO–213 contract, but not a demand to terminate Domke's employment at Champion. Knickrehm suggested to Disbrow that Domke be allowed to continue to work on BPO–213 for ninety more days, while an alternative position was found for him within Champion. Disbrow asked that Domke be chaperoned while he continued to work on BPO–213 because Disbrow was concerned about Domke's hostility.

In late October 1998 Disbrow complained to Knickrehm that Domke had arrived to work in Valdez unchaperoned. Domke

claims that he was ordered to go to Valdez alone and that when Disbrow found out that he was in Valdez, Disbrow "went ballistic again and demanded that I be pulled off the contract immediately." Domke was terminated on November 2, 1998. The parties dispute whether Disbrow and Alyeska requested or influenced Domke's ultimate termination by Champion.

On January 20, 2000, Domke sued Champion, Alyeska, Disbrow and Knickrehm, alleging (1) that Alyeska and Disbrow had tortiously interfered with his Champion employment contract; (2) that Alyeska, Disbrow, Champion and Knickrehm had conspired to interfere with the same contract; and (3) that Champion and Knickrehm breached the implied covenant of good faith and fair dealing in terminating his employment. Domke later amended his complaint to include allegations of breach of contract and of tortious retaliatory discharge in violation of public policy for whistleblowing.

Champion counterclaimed on February 28, 2001, for conversion, assumpsit, unjust enrichment, and breach of contract against Domke for retaining the five overpayments he received after leaving his consulting position. Champion alleged that it only discovered that Domke intended to keep the overpayments after Domke brought suit.

Domke denied these counterclaims and moved for summary judgment against Champion, arguing that its counterclaims were barred by the statute of limitations. The court found that the counterclaims were compulsory and thus related back to the date of Champion's answer. The court also noted, in the alternative, that there was a genuine issue of material fact as to when Champion discovered all the elements of its cause of action. The court subsequently granted summary judgment motions to dismiss Domke's conspiracy claim as to Alyeska and his request for non-economic damages against Champion.

On January 28, 2002, the defendants made an offer of judgment for $150,000 plus "prejudgment interest, costs calculated under Alaska Rule of Civil Procedure 79, and attorney's fees calculated pursuant to the schedule for contested with trial under Alaska Rule of Civil Procedure 82(b)(1)." Domke rejected this offer, and the case proceeded to a month-long trial beginning April 22, 2002. After hearing Domke's case, the court entered a directed verdict dismissing Domke's claims against Knickrehm, finding that Knickrehm could not be held personally liable because Domke had conceded that Knickrehm acted at all times within the scope of his employment. The jury found that Disbrow had interfered with Domke's employment contract, that Champion had breached the implied covenant of good faith and fair dealing as Domke's employer, but that Domke was thirty percent at fault for the interference with his contract. The jury awarded Domke $10,000 in economic and $5,600 in non-economic damages. It also found in favor of Champion's counterclaims for unjust enrichment and conversion, awarding Champion $19,600 in damages but reducing the award to reflect that Champion was forty percent at fault on the counterclaims.

On post-trial motions, the court found that the pretrial offer of judgment exceeded the jury's verdict; accordingly, the court entered final judgment in favor of the defendants for $157,376 in attorney's fees and $54,148.16 in costs. Domke appeals.

## III. DISCUSSION

### A. Post–Trial Motions

After the jury returned its verdict, Domke moved for a new trial on the issue of damages and for a judgment notwithstanding the verdict to hold Alyeska vicariously liable for Disbrow's tortious interference. The court denied these motions, and Domke challenges these rulings on appeal. We consider each ruling in turn.

#### 1. Motion for new trial on damages

Domke initially asserts that the superior court erred by denying him a new trial on the issue of damages. A dissatisfied litigant may move for a new trial "in the interests of justice" under Alaska Civil Rule 59(a). Denial of a motion for a new trial lies in the

sound discretion of the trial court.[1] We will affirm a denial order entered under Rule 59(a) if the evidence, viewed in the light most favorable to the non-moving party, provides any basis for the jury's decision.[2] Conversely, we will reject a jury's award of damages and order a new trial only when the evidence supporting the jury's conclusion is "so completely lacking or slight and unconvincing as to make the verdict plainly unreasonable and unjust."[3]

Here, the jury awarded Domke $10,000 in economic damages for Champion's breach of the implied covenant of good faith and fair dealing and Disbrow's interference with Domke's employment contract. Comparing this award to his monthly salary, Domke reasons that the jury awarded him only two months' back pay. He protests that the evidence fails to support such a small award for back pay because he was a valuable employee with a reasonable expectation of further employment. In Domke's view, then, the jury must have mistakenly "speculated that Domke's employment contract with Champion would have naturally expired on or about December 23, 1998 had Disbrow not interfered with this contract."

Champion responds that the jury's award makes sense. It posits that "[t]he jury could have found [that] there was no unlawful interference [by Disbrow] prior to October 1, 1998, but that Disbrow interfered between October 1 and November 2, 1998, when Disbrow's objection to Domke in Valdez resulted in early termination." Pointing to evidence that Champion had assigned Domke to work on BPO–213 only until the end of December 1998, and that it had agreed to employ him after that only if it found him another position, Champion argues that the jury could reasonably have found that Domke would not likely have worked beyond December in any

event, so any interference only resulted in two months' lost wages.

Champion's argument finds support in the record. The parties agreed that Domke was an at-will employee. On October 1, 1998 Disbrow sent Knickrehm an e-mail that Knickrehm interpreted as requesting that Domke be removed from the Alyeska contract. Knickrehm asked for ninety days to find another position within Champion for Domke. Knickrehm testified that he told Domke that Domke was being removed from the Alyeska project after ninety days, and that Champion would have to try and find another job for him after that. Domke himself acknowledged understanding that "at the end of the 90 days if Mr. Knickrehm could not find another position for me, that my job was over." Moreover, Knickrehm testified that he had located and offered Domke other available positions outside Alaska—including an international position in which Domke could have worked thirty days on and thirty days off—but that Domke had rejected all these offers, refusing to accept any positions outside Alaska. The jury further heard evidence that Disbrow had pressed Knickrehm to terminate Domke in late October 1998. As Domke put it, Disbrow "went ballistic again and demanded that I be pulled off the contract immediately." Domke was terminated on November 2, 1998.

■ Based on this evidence, it would not have been irrational for the jury to find that Domke was unfairly fired in early November but that his employment with Champion likely would have expired at the end of December 1998 in any event because Champion might not have been able to find a new job that met his satisfaction. Because the evidence here was not "so completely lacking or slight and unconvincing as to make the verdict plainly unreasonable and unjust,"[4] we decline to reverse the superior court's order denying a new trial on the damages issue.[5]

---

1.  *Reeves v. Alyeska Pipeline Serv. Co.,* 56 P.3d 660, 668 (Alaska 2002).

2.  *Pugliese v. Perdue,* 988 P.2d 577, 581 (Alaska 1999).

3.  *Id.*

4.  *Id.*

5.  *Compare, e.g., Grant v. Stoyer,* 10 P.3d 594 (Alaska 2000), and *Pugliese,* 988 P.2d at 581–83 (both holding that new trial required where unrebutted evidence established liability and existence of some damages, but jury awarded nothing), *with Richey v. Oen,* 824 P.2d 1371 (Alaska 1992) (declining to order new trial over disputed damages and over whether some evidence that

### 2. Motion for JNOV on vicarious liability

The jury found that Disbrow interfered with Domke's contract but that Disbrow's employer, Alyeska, was not vicariously liable. Domke argues that the trial court erred by refusing to grant a judgment notwithstanding the verdict (JNOV)[6] that would have found Alyeska vicariously liable for Disbrow's tortious interference. In response, Alyeska initially contends that Domke failed to move for a directed verdict as to Alyeska's vicarious liability, so he waived his right to request a judgment notwithstanding the verdict. But the record fails to support this contention.

After presenting his case at trial, Domke moved for a directed verdict establishing both Disbrow's and Alyeska's liability on the tortious interference claim. The trial court responded that, in its view, there were material fact issues for the jury to resolve. The court invited Domke to argue the point and gave him two minutes to do so, but it directed the subject of the argument to the question whether Alyeska and Disbrow were justified in their actions toward Domke. Given the limited focus of the argument invited by the court, we think that it would be unrealistic to view Domke's failure to expressly mention vicarious liability as a waiver of the point. Under the circumstances, his general motion for a directed verdict establishing Alyeska's liability can best be seen as encompassing all reasonably apparent theories of liability, including the theory that the company was vicariously liable as Disbrow's employer. Accordingly, we conclude that Domke adequately preserved this question to raise it in his post-trial motion for a JNOV.

■ Alyeska also contends that reasonable jurors could have differed as to whether Disbrow was acting within the scope of his employment when he interfered with Domke's employment contract. "We review the denial of a judgment notwithstanding the verdict only 'to determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment of the facts.' "[7] Under Alaska law, employers are ordinarily held vicariously liable for acts performed by their employees within the scope of their employment.[8] We apply "a flexible, multi-factored test" to determine whether an employee has acted in the scope of employment in a given case,[9] looking to relevant factors listed in § 228 of the Restatement (Second) of Agency:

(1) Conduct of a servant is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master, and

(d) if force is intentionally used by the servant against another, the use of force is not unexpected by the master.

(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

■ Applying these factors here, we see nothing in the evidence that might have enabled reasonable jurors to conclude that Disbrow's interference with Domke occurred outside the scope of his employment with Alyeska. Disbrow was the contract steward of BPO–213 for Alyeska. Part of his job description, as outlined in section 29 of the BPO, was to review and confirm Champion's performance under the contract. Thus, reviewing and commenting on Domke's performance with respect to BPO–213 fell squarely within the job that Disbrow was authorized to perform.

Disbrow testified that he wanted Domke removed from the Champion contract for

tended to show plaintiff's injury pre-existed accident).

6. See Alaska R. Civ. P. 50(b).

7. Reeves, 56 P.3d at 668 (quoting Richey, 824 P.2d at 1374).

8. VECO, Inc. v. Rosebrock, 970 P.2d 906, 911 (Alaska 1999).

9. Doe v. Samaritan Counseling Ctr., 791 P.2d 344, 346 (Alaska 1990).

several reasons. These reasons included Domke's lack of performance, his absenteeism, continuing communication problems, and Domke's attitude. Moreover, Disbrow testified that before he sent Knickrehm an e-mail requesting that Domke be removed from the employment contract, he cleared the e-mail with his own boss at Alyeska, Eldon Johnson. These events demonstrate that Disbrow acted within the time and space limits of his employment. And even if the jury accepted Domke's theory that Disbrow's actions were motivated by his belief that Domke was a whistleblower, those actions would at least in part have been meant to serve what Disbrow saw as being in Alyeska's best interests.

Even when we view the evidence in the light most favorable to Alyeska, then, we conclude that the record compels a finding that Alyeska was vicariously liable for Disbrow's tortious interference with Domke's contract. Because Domke was entitled to a JNOV establishing Alyeska's liability for Disbrow's conduct, we must remand with directions to amend the judgment to reflect this conclusion.

### B. Counterclaims

Domke next argues that Champion's counterclaims for conversion and unjust enrichment were barred by the statute of limitations. In denying Domke's motion for summary judgment on this point, the superior court ruled that the counterclaims were compulsory, so they related back to the date of Champion's answer and were therefore timely. The court alternatively ruled that there were material issues of fact regarding when Champion was on notice that Domke intended to keep the overpayments—an element of Champion's claims. Domke returned to the timeliness question at the end of the trial, asking the court to instruct the jury on the statute-of-limitations issue. The court declined to give his proposed instructions. Domke now challenges these rulings.

A compulsory counterclaim relates back to the date of a party's answer; a permissive counterclaim does not.[10] Under Alaska Civil Rule 13(a), a claim is compulsory when it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties." We have identified the following factors as helpful in construing the phrase "transaction or occurrence": "whether the facts are related in time, space, origin, or motivation; whether they form a convenient trial unit; and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage."[11] Alternate ways of determining whether two claims arise from the same "transaction or occurrence" include looking for a "logical relationship" between the claims, or whether the claims "would involve similar testimony . . . the same exhibits, and the same parties."[12]

Domke asserts that, since the overpayments were the product of his consulting contract rather than the employment contract that resulted in his claims against Champion, Champion's counterclaims did not arise from the same "transaction or occurrence" as his own. He insists that there is no "factual overlap" between the claims because the overpayments occurred roughly a year before Champion breached the implied covenant and because there was no relationship or connection between the two events.

Champion responds that any counterclaims arising out of the employment relationship between Champion and Domke would be compulsory because defense of Domke's claims and prosecution of its counterclaims would require the same witnesses and evidence. It argues that Domke's breach of contract claims and its own counterclaims arise from the same "transaction or occurrence" because they could only be decided by reference to the terms of Domke's employ-

---

10. Alaska R. Civ. P. 13(a), (b) and 15(c); *Mogg v. Nat'l Bank of Alaska*, 846 P.2d 806, 813–14 (Alaska 1993).

11. *Miller v. LHKM*, 751 P.2d 1356, 1361 (Alaska 1988) (citing RESTATEMENT (SECOND) OF JUDGMENTS § 24(2) (1981)).

12. *Ellingstad v. State, Dep't of Natural Res.*, 979 P.2d 1000, 1010 (Alaska 1999) (quoting *Miller*, 751 P.2d at 1361, and 6 CHARLES ALAN WRIGHT & ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1410, at 65 (2d. ed.1990)).

ment contract. It asserts that once Domke placed his own "work performance, work character and credibility at issue," evidence that he wrongfully kept the overpayments was relevant in rebuttal. Also, it insists that the facts underlying its counterclaims would necessarily be introduced under the after-acquired evidence doctrine.

In *Wells v. Noey,* we held that an action to declare a tax deed invalid was compulsory when the validity of the tax deed was a necessary element in an earlier action between the parties to quiet title by adverse possession.[13] We concluded that the interdependence of the two claims satisfied the logical relationship test.[14] We noted that the claims shared the same evidentiary basis, and that proving the deed valid had been necessary to establish adverse possession in the earlier suit between the parties; in our view, these factors established that the action to declare the tax deed invalid was compulsory.[15]

We find no comparable interrelationship here between Champion's counterclaims and Domke's claim. Champion's evidentiary argument does establish some similarity, but the similarity of evidence between the two suits is not by itself controlling. While the same parties and witnesses might appear in both actions, Champion's ability to recover the value of the consultant overpayments did not depend on the success or failure of

Domke's claims.[16] Conversely, a decision on Champion's counterclaims was not necessary to the result in Domke's suit. If Domke had pressed suit immediately and reached judgment before Champion discovered the overpayments, Champion would not have been barred under Civil Rule 13(a) from asserting its claims in a separate action. Furthermore there is no logical relationship between the claims. In *Ellingstad v. State, Department of Natural Resources,* we found no logical relationship between claims that arose from the same land contracts but "involv[ed] entirely different legal questions."[17] While we can imagine many instances where counterclaims of conversion and unjust enrichment could have a logical relation to an employee's claims arising from breach of an employment contract by the employer, that is not the case here.

Because we conclude that Champion's counterclaims were permissive rather than compulsory, we must next consider Domke's argument that the counterclaims were barred by the statute of limitations.[18] The trial court did not squarely address this point. Instead, in denying Domke's motion to dismiss the counterclaims on summary judgment, the court found that material questions of fact remained in dispute regarding when Champion had notice of its counterclaims. Because of this unresolved factual dispute, the court also saw no need at that point to address Champion's alternative argument

13. 399 P.2d 217 (Alaska 1965).

14. *Id.* at 220.

15. *Id.* at 219–20.

16. *See Wells,* 399 P.2d at 219–20 (finding plaintiff's claim that tax deed was invalid was compulsory and should have been brought in prior action by defendant to quiet title by adverse possession, because earlier adverse possession claim required that tax deed be proven valid).

17. 979 P.2d 1000, 1010 (Alaska 1999). The claims in *Ellingstad* also did not require "examination of the same evidence, facts, or circumstances." *Id.* Here, while evidence of Domke's conversion of the overpayments was *admissible,* for reasons further addressed below, the controversy surrounding the overpayments was not necessary to prove Domke's claim or integrally related to the claim. *See Iglesias v. Mutual Life*

*Ins. Co. of New York,* 156 F.3d 237, 240–42 (1st Cir.1998) (employer's counterclaim for restitution was permissive rather than compulsory, because the counterclaims did not involve the same "operative" facts as employee's discrimination and contract claims, despite use of evidence supporting restitution claim to attack credibility of the employee).

18. We note that neither party's briefing has specified what statutory limit would govern the disputed counterclaims, and the superior court does not appear to have decided the issue. Although Champion's conversion claim would likely be governed by the two-year limit for tort claims, unjust enrichment is essentially a contract claim, so it would be subject to the three-year limit established in AS 09.10.053 for actions "upon a contract or liability, express or implied." Since the jury found in Champion's favor on both alternative counterclaim theories, the longer time limit for unjust enrichment would be dispositive here.

that Domke should be equitably estopped from asserting his statute of limitations defense. But as noted above, these rulings were based on the erroneous premise that Champion's counterclaims were compulsory and related back to the date that Champion filed its answer.

When Domke attempted to return to these issues at trial by requesting a jury instruction on the statute-of-limitations issue, the superior court denied his motion on the ground that his proposed jury instruction was untimely. The court thus submitted the case to the jury, and eventually entered judgment, with the disputed statute-of-limitations issues still unresolved. Although we recognize that Domke admittedly filed his proposed jury instruction late, and that the instruction was properly rejected on that ground, the unresolved statute-of-limitations issues addressed in that instruction raised preliminary questions of fact that did not need to be referred to the jury and could have been properly decided by the trial court itself.[19] Accordingly, the court's rejection of Domke's late jury instruction did not eliminate the need to address these unresolved issues. For this reason, Domke's procedural lapse in submitting the proposed instruction late cannot be viewed as an abandonment of the underlying legal point the instruction addressed.

Given these circumstances, we hold that the trial court's reliance on the mistaken premise that the counterclaims were mandatory requires us to remand this case for further consideration of the unresolved statute-of-limitations issues: when Champion had reasonable notice of Domke's conversion and whether the doctrine of equitable estoppel applies to the counterclaims. On remand, the superior court should resolve disputed factual issues concerning these points by considering all relevant evidence in the record, including evidence presented in connection with Domke's summary judgment motion and evidence presented during the trial. If the court finds that Champion's counterclaims were barred in whole or in part by the statute of limitations, it should disallow the jury's award on the counterclaims to the extent necessary to conform with its ruling.

## C. Severance of Champion's Counterclaims

■ Domke separately argues that the court erred by denying his motion to sever the trial of the counterclaims from the trial of his complaint. He asserts that allowing Champion to present its counterclaims unfairly tainted the jury's perception of his case, and he suggests that Champion's pursuit of its counterclaims was motivated more from a desire to cast him in a negative light than from belief in their merits.

■ Under Alaska Civil Rule 42(b), separate trials are appropriate to ensure "convenience or to avoid prejudice," or when "conducive to expedition and economy." The trial court's decision to deny a severance motion is reviewed for abuse of discretion.[20] We have held that a separate trial on a defendant's counterclaims is unnecessary when the counterclaims share the same issues of fact as the defendant's affirmative defenses.[21] When that is the case, the plaintiff suffers no prejudice other than the unavoidable prejudice caused by the defendant's assertion of the factual basis of the affirmative defenses, so trying the counterclaims with the plaintiff's case in chief is "conducive to expedition and economy."[22]

---

**19.** *See Cikan v. ARCO Alaska, Inc.,* 125 P.3d 335, 339 (Alaska 2005) ("[T]he task of interpreting and applying a statute of limitations traditionally falls within the province of the courts; so when a factual dispute precludes entry of summary judgment the dispute must ordinarily be resolved by the court[.]"); *John's Heating Serv. v. Lamb,* 46 P.3d 1024, 1033 (Alaska 2002) (remanding a statute of limitations issue "to the superior court for determination as a preliminary question of fact"); *see also Pedersen v. Zielski,* 822 P.2d 903, 907 (Alaska 1991) (noting that issues concerning the application of the discovery rule that "are genuine issues of material fact ... must be resolved at an evidentiary hearing" before the trial court).

**20.** *Miller v. Sears,* 636 P.2d 1183, 1192 (Alaska 1981).

**21.** *Id.*

**22.** *Id.* (quoting Alaska R. Civ. P. 42(b)).

Here, Champion asserted an after-acquired evidence defense to Domke's retaliatory discharge claim. Under this theory, it claimed that it would have fired Domke once it discovered that he had kept the consultant overpayments. Asserting this defense required that Champion present the same evidence that it required for its counterclaims: that Domke had wrongfully retained the overpayments. Indeed, before trial, in response to Domke's complaints that the counterclaims would unfairly put his character at issue, Champion offered to stipulate that the same facts underlay the counterclaims and its affirmative defenses. Because Domke asserts no concrete reason that presentation of the counterclaims prejudiced his case beyond the damage that would have been done by Champion's prosecution of its affirmative defense, we find that the trial court did not err by denying his motion.

### D. Champion's After–Acquired Evidence Defense

In *Brogdon v. City of Klawock*, we recognized that after-acquired evidence of an employee's wrongdoing may be introduced in employment cases.[23] But our discussion of the after-acquired evidence doctrine was brief.[24] We did not, for example, decide what limits the trial court should place on the introduction of post-termination justifications, or whether "a new cause for termination merely serves to limit damages or eliminates entirely the right to damages."[25]

In its answer to Domke's complaint, Champion asserted that "[t]he doctrine of after-acquired evidence bars plaintiff's recovery in whole or in part." The gist of Champion's defense was that it would have terminated Domke once it discovered that he kept and cashed the consultant overpayments. The trial court declined to dismiss this defense at summary judgment, finding that "issues of fact exist as to who knew about the checks, what was known about these checks. Further, issues of fact exist as to whether Domke would have been terminated if Champion had known about the alleged improper retention of these checks." An instruction on Champion's defense was submitted to the jury.[26] The jury found that Domke's wrongful retention of the consultant overpayments did not bar him from recovery for Champion's breach of the implied covenant of good faith and fair dealing.

Domke nonetheless argues on appeal that the court erred when it refused to grant summary judgment on Champion's defense. Domke asserts that he demonstrated in his summary judgment motion that Champion was aware of the overpayments—and that Domke had cashed the checks—during the course of his employment. According to Domke, this means that the evidence relating to the consultant overpayments was not "after-acquired" and that Champion's defense should have been dismissed at summary judgment.

But Domke fails to show that he was prejudiced by the trial court's decision. The jury

23. 930 P.2d 989, 991–92 (Alaska 1997).

24. *Id.* at 992.

25. *Id.*

26. Jury Instruction No. 32 read:

Champion Technologies has asserted that after the termination of Domke's employment, evidence was acquired by Champion Technologies that Domke had engaged in misconduct which justified termination, and that this amounts to a defense to his claims. . . .

First, you must determine whether . . . Champion . . . had knowledge of Domke's allegedly wrongful conduct prior to his termination.

Next, in order to establish this defense, Champion has the burden of proving by a preponderance of the evidence all of the facts necessary to establish:

1) Domke wrongfully retained $19,600 of consultant's pay from Champion Technologies' funds to which he was not entitled;

2) Domke's wrongdoing was of such severity that he in fact would have been terminated on those grounds alone if Champion Technologies had known of it at the time of the termination.

If you find that Champion Technologies breached the contract of employment and/or that Domke was wrongfully terminated, but also that Champion Technologies was justified in that action by reason of Domke's wrongful conduct discovered thereafter, Domke's damages are limited to the back pay he would have earned from the date of termination until the date of the discovery of the misconduct.

ultimately found in Domke's favor on Champion's defense. The only potential source of prejudice lies in the evidence of Domke's misconduct with regard to the overpayments that was introduced to support Champion's theory. Domke insists that the overpayments were known to Champion during his employment, and he suggests that, since Champion did not terminate him after gaining this knowledge, the fact of the overpayments is completely irrelevant to the issues raised by his claims. Yet even if Champion *had* learned of the overpayments while Domke was still working, and even if it knew that he intended to keep them, this evidence still would have been admissible to rebut Domke's evidence of his own good character and reasonable expectation of long-term employment. At most, then, allowing the jury to hear Champion's after-acquired-evidence defense amounted to harmless error.

**E. Special Verdict on Fault Allocation**

Under AS 09.17.080, the court must instruct the jury to apportion fault among all parties in a civil action, including "each claimant, defendant, third-party defendant, person who has been released from liability, or other person...." According to AS 09.17.900, " 'fault' ... includes acts or omissions that are in any measure negligent, reckless, or intentional toward the person or property of the actor or others, or that subject a person to strict tort liability." During the trial, the superior court ruled that these fault-allocation provisions did not apply to Domke's claim of tortious interference with his employment contract. The court nonetheless thought that this issue was close, acknowledging that "in this case there may be a real legitimate dispute in the law." To avoid the need for a new trial if its ruling was

reversed on appeal, the court announced, just before submitting the case to the jury, that it would preserve the record by submitting a special verdict form allowing the jury to allocate fault on the tortious interference claim. After the jury returned a verdict finding Domke thirty percent at fault on that claim, the court changed its ruling on the fault-allocation requirement, held it applicable, and calculated the final judgment by using the jury's finding on comparative fault.

Domke now argues that the trial court erred in two respects. First, he contends, a plaintiff cannot share responsibility for a defendant's intentional tort against the plaintiff. Domke reasons that the lack-of-justification element of a tortious interference claim essentially rules out comparative fault, making the concept redundant and illogical in the context of such claims: If the plaintiff is at fault, Domke posits, then the defendant's interference would be justified. Second, Domke argues, the last-minute timing of the court's decision to instruct on allocation prejudiced him by precluding any opportunity to argue the issue to the jury.

Champion responds that the trial court did not have discretion to exempt Domke from fault allocation, because the allocation statute is mandatory.[27] Champion also insists that Domke waived any claim of prejudice resulting from the timing of the court's decision because he "did not assert a claim of prejudice after closing statements, seek additional time to supplement his closing, or provide a record of how his closing may have been altered based on the trial court's ruling."

■ But the record demonstrates that Domke adequately preserved his argument based on timing.[28] And under the circum-

**27.** In *Shields v. Cape Fox Corp.*, 42 P.3d 1083, 1087–89 (Alaska 2002), we held that it was plain error under an earlier version of AS 09.17.080 for the trial court not to instruct the jury on comparative fault in a conversion case involving both tangible-property loss and purely economic loss. Our ruling in this case on the timing of the trial court's decision to allow the jury to allocate fault makes it unnecessary to decide whether Domke's case is distinguishable from *Shields*.

**28.** In arguing about whether the court should submit a last-minute verdict form allowing the

jury to allocate fault on this claim, Domke maintained at trial that the verdict form should not be submitted, because the court's fault-allocation ruling was correct on its merits, so omitting the special verdict form would not cause any harm. But Champion argued in favor of the special verdict, insisting that the fault-allocation statute applied and required allocation. In response to Domke's claim that omitting the special verdict form would cause no harm, Champion's trial counsel insisted that the defendants had already been harmed: "[D]efendants have been substantially prejudiced because they did have to alter

stances at issue here, we hold that it was an abuse of discretion to announce for the first time after counsel had made their closing arguments that the allocation issue would go to the jury. The court submitted the disputed special verdict form on fault allocation without allowing either party the benefit of closing arguments or explanatory jury instructions. This prejudiced both sides by depriving them of any opportunity to discuss the issue of allocation in their arguments to the jury.

To determine an appropriate remedy for the prejudice stemming from the late instruction, we must next consider whether the allocation statute required fault to be allocated here. If so, a retrial on the issue of allocation would be necessary; if not, the proper remedy would simply be to disregard the jury's allocation.

Relying on AS 09.17.900, which defines "fault" to include all "acts or omissions that are in any measure negligent, reckless, or intentional," Champion argues that "[t]he facts in this case permitted the jury to reasonably conclude Domke's failure to perform assigned tasks in a professional manner or his unprofessional conduct negligently placed him in danger of being transferred and/or terminated while also concluding that when Disbrow sought Domke's early termination, it was due to Disbrow's unjustified motives." In Champion's view, then, Domke was negligent through his actions of being "unprofessional," which combined with Disbrow's intentional interference to cause Domke's firing.

But Champion's argument begs the question of the role played by the element of justification in a cause of action for tortious interference with a third party's contract. Here, as we have already discussed, Disbrow was found liable for tortious interference based on conduct occurring in the course of working as an employee of Alyeska on a contract with Champion. If Domke's allegedly unprofessional conduct impaired Disbrow in performing his job or damaged

Alyeska's business interests, then Disbrow would have been justified in seeking to have Domke disciplined or discharged by Champion; and this justification would have completely absolved him from being held liable for interfering in Domke's employment. Conversely, if Domke's lack of professionalism was so unrelated to Disbrow's actions that it gave him no justification for interfering with Domke's employment, then this lack of a causal nexus would preclude treating Domke's unprofessional conduct as a legal cause of his own firing. Any "negligence" on his part would have played no direct and significant role in causing the specific harm at issue—the interference that prompted his firing. In context, then, the lack-of-justification element played two simultaneous roles: it established actionable misconduct by Disbrow and ruled out legally relevant contributory causation by Domke.

■■■ Alaska's statutory provision governing allocation of fault reinforces this view of the tortious conduct at issue here. Though AS 09.17.080 potentially encompasses a broad array of causes of actions, the statute specifically requires fault to be allocated only in "actions involving fault of more than one person"; and in such cases it specifies that in allocating fault the jury must "consider both the nature of the conduct of each person at fault, and the extent of the causal relation between the conduct and the damages claimed." Here, the "nature" of the cause of action at issue—its established definition— required Disbrow's *unjustified* interference to be the but-for cause of Domke's firing; at the same time, Disbrow's lack of justification negated the existence of any legally relevant "causal relation" between unprofessional or otherwise inappropriate conduct by Domke and the specific "damages claimed" in his action against Disbrow.

■■■ Put simply: The definition of the cause of action does not allow a finding that the harm Disbrow caused was partly justified. And Domke neither owed nor breached any identifiable legal duty to exercise due

---

their closing argument to take out any language to that effect, based on the Court's prior ruling." Domke's counsel replied: "Well, I think that prejudice would go both ways, wouldn't it?"

The court then acknowledged that "It goes both ways," but nonetheless elected to submit the last minute special verdict form.

care to prevent *unjustified* acts of tortious interference by third parties like Disbrow.[29] Notably, Champion cites no authority to support its claim that an employee's general "unprofessionalism" or abrasiveness can provide an actionable basis for allocating liability based on contributory fault on a claim against a third party for tortious interference with the employee's employment contract; nor does Champion cite any authority applying comparative fault under similar circumstances. Under these circumstances we decline to hold that AS 09.17.080 required the superior court to give an instruction allowing the jury to consider allocating fault to Domke on his claim for tortious interference.

Because we hold that an instruction on allocation of fault was not called for here, we conclude that the prejudice resulting from the last-minute instruction does not require a retrial to allow reallocation of fault; instead, the proper remedy on remand will be to strike the thirty-percent allocation of fault against Domke and to amend the awards against Disbrow and Alyeska to reflect full liability.

### F. Claims Against Knickrehm

At the close of Domke's case, Knickrehm moved for a directed verdict, arguing that he could not be personally liable for conspiring to interfere with Domke's contract or breaching Champion's implied covenant of good faith and fair dealing, because Knickrehm had acted within the scope of his employment. Domke conceded that Knickrehm had acted within the scope of his employment but maintained that he could nonetheless be personally liable if his actions in interfering with

Domke's contract were intentional and malicious. The court dismissed the claims against Knickrehm, concluding as a matter of law that as an employee acting within the scope of his employment, Knickrehm could not interfere with a contract to which his employer was a party.

Knickrehm maintains that the superior court correctly reached this conclusion. He also notes that we have previously recognized that agents cannot be "personally liable for a breach of contract so long as the fact of their agency and the identity of the principal are disclosed." [30] Here, it is undisputed that Domke was aware that Knickrehm acted on behalf of Champion.

Domke responds that "a supervisor can be personally liable for his role in the interference with his subordinate's employment contract caused by his own independently tortious or malicious acts." In support of this contention, Domke cites *Jones v. Central Peninsula Hospital*,[31] where we favorably referred to *Wagenseller v. Scottsdale Memorial Hospital*,[32] an Arizona case that supports Domke's position. According to Domke, *Jones's* reliance on *Wagenseller* makes his theory "the rule of law in Alaska." Domke claims that there was enough evidence to support a finding that Knickrehm engaged in independently tortious acts: According to Domke, Knickrehm failed to abide by Alyeska's "policy against co-employment," lied to Champion about Domke's actions, and lied to Alyeska "when he told [Alyeska] that Domke's termination had nothing to do with Disbrow."

---

**29.** We recognize that even if Domke did nothing to justify Disbrow's efforts to have him terminated, Domke might have been a problematic employee, and his performance on the job might have irritated his superiors at Champion and predisposed them to terminate him more readily than they might have terminated a less difficult employee. But even if this kind of general "unprofessionalism" made Domke a likely prospect for firing, this behavior could not properly be deemed a proximate cause of Champion's decision to actually fire him on November 2, 1998; instead, his vulnerability to termination would simply have diminished his predictable tenure as a Champion employee—a factor that the jury was entitled to consider, and presumably did consid-

er, in deciding how much to award Domke for lost wages resulting from his termination.

**30.** *Jensen v. Alaska Valuation Serv., Inc.,* 688 P.2d 161, 162–63 (Alaska 1984) ("Although officers of a corporation will not ordinarily be held personally liable for contracts they make as agents of the corporation, they must disclose their agency and existence of the corporation before they will be absolved from liability.").

**31.** 779 P.2d 783, 791 n. 10 (Alaska 1989).

**32.** 147 Ariz. 370, 710 P.2d 1025 (1985), *superseded in other respects by* Arizona Revised Statute § 23–1501 (1996).

But we need not decide if Domke's theory of error has legal merit; even assuming for the sake of argument that it does, we conclude that Domke has failed to carry his burden of establishing that the alleged error actually caused any substantial prejudice. Initially, we note that the extent of the prejudice that Domke realistically might have suffered would have been relatively slight at most. As Domke conceded at trial, his implied covenant and tortious interference claims against Champion, which remained intact, accomplished essentially "the same thing" as his dismissed claim against Knickrehm could have accomplished. Thus, if the court had left Domke's interference claim intact and he had won a judgment against Knickrehm, there is no reason to suspect that his judgment would have exceeded the award he actually received on his judgment against Champion. At best, he might have had identical judgments against Knickrehm and Champion instead of a judgment against Champion alone.

More important, even if the jury accepted Domke's description of Knickrehm's conduct, it would not necessarily have determined that Knickrehm acted maliciously or committed independently tortious acts, as would have been required for a finding of liability under *Wagenseller* and *Jones*. The conduct alleged by Domke could as easily have been seen as evincing Knickrehm's genuine desire to protect the interests of his employer, Champion. Domke does not explain why a finding of malicious or independently tortious actions would have been likely, and our own review of the record fails to persuade us of a fair probability that the jury would have made such a finding. We thus conclude that Domke has failed to make a showing of prejudicial error.

### G. Champion's Negligence on Its Counterclaim

Finally, Domke argues that even if Champion's counterclaims were compulsory, the court erred when it refused to instruct the jury on Champion's possible negligence in its counterclaim based on unjust enrichment. Domke's proposed instruction would have told the jury that Champion could not recover anything on its counterclaims if the jury found that Champion acted negligently in failing to discover that it was mistakenly paying Domke for two jobs. Domke insists that the evidence supported this instruction, alleging that Champion's payroll supervisor knew of the overpayments as they occurred, and violated his duty to "pay[ ] attention to his costs like he was required." But Domke concedes that his proposed jury instruction was untimely, and he offers no valid excuse for filing it late. Domke also fails to cite any Alaska authority for the proposition that negligence on Champion's part should have barred recovery on its counterclaims completely. As the case stands now, Domke received the benefit of a comparative fault determination on Champion's counterclaims, in which the jury apportioned forty percent of the loss to Champion. The superior court's refusal to give Domke's late instruction did not amount to plain error merely because it might have produced a better result.

## IV. CONCLUSION

For the reasons stated above, we REMAND with directions for the superior court to hold an evidentiary hearing to determine whether Champion's counterclaims were barred by the statute of limitations and to amend the judgment by disallowing the counterclaims to the extent that the court finds that they were time-barred. We also direct the court to enter a judgment notwithstanding the verdict holding Alyeska vicariously liable for Disbrow's tortious interference. Finally, we direct the court to amend the judgment by vacating its provisions apportioning fault to Domke on his tortious interference claims and by awarding him full, unapportioned damages on those claims. In all other respects we AFFIRM the judgment.

EASTAUGH, Justice, not participating.