Judy MacDONALD, Appellant,

v.

Jack RIGGS and Merle G. Wilson, Appellees.

No. S–12025.

Supreme Court of Alaska.

Aug. 31, 2007.

Z. Kent Sullivan, Baxter Bruce Sullivan P.C., Juneau, for Appellant.

Jack L. Riggs, pro se, Anchor Point.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

### OPINION

MATTHEWS, Justice.

## I. INTRODUCTION

Judy MacDonald sued Jack Riggs for assault, battery, false imprisonment, and intentional infliction of emotional distress. The jury found for Riggs on all claims and awarded him $35,000 in damages from MacDonald on his defamation counterclaim. MacDonald appeals the superior court's denial of her motion for judgment notwithstanding the verdict (JNOV) on the counterclaim.

With respect to the three arguments that MacDonald presents, we conclude as follows:

(1) there was sufficient evidence regarding defamatory statements by MacDonald to create a jury question as to liability for defamation;

(2) MacDonald's statute of limitations defense fails because the date of Riggs's counterclaim relates back to the date of MacDonald's complaint; and

(3) since MacDonald's defamatory statements are slander per se, an award of damages could be made without proof of actual damages.

## II. FACTS AND PROCEEDINGS

The City of Tenakee Springs passed a local ordinance prohibiting the use of motorized vehicles in many areas in and around the town. This lawsuit resulted from a dispute over whether the ordinance prohibited the use of a motorized wheelbarrow. Judy Mac-Donald, then a sixty-four-year-old widow, regularly used the wheelbarrow in question to haul groceries and supplies on a road that provided the only access to her property from a nearby boat landing. On one occasion she drove an excavator up the road. In 2001 the City of Tenakee Springs created a "legal research committee" to investigate the legality of the use of the wheelbarrow and the excavator on the road and appointed Mac-Donald's neighbor, Merle Wilson, chair.

After the committee was formed, Wilson took it upon himself to personally impound the wheelbarrow. In the course of the impoundment he assaulted MacDonald, striking her with either a logging chain or the metal end of a dog leash. Wilson also attempted a citizen's arrest, ostensibly because Mac-Donald tried to assault him, and took Mac-Donald to his nearby house. At trial Wilson claimed that his actions were in self-defense.

There was a factual dispute at trial over the extent to which Jack Riggs was involved. MacDonald claims that Riggs, an ex-boyfriend, threatened her with a rifle during the assault and that after the assault both Riggs and Wilson forced her to return to Wilson's house. Riggs and Wilson claim that Riggs did not appear at the scene until after the assault occurred and that he was unarmed. Riggs also claims that his actions after the attack were aimed at assisting her with her injuries.

After the attack MacDonald left Wilson's house and made her way to a nearby beach where other neighbors were present. A neighbor took her by boat into the center of town, where she was seen by local EMTs and had her injuries photographed. The EMTs flew her to a hospital in Juneau for additional treatment. In Juneau she was diagnosed with a skull fracture and transferred to Harborview Hospital in Seattle. She was discharged after two days at Harborview but remained in a hotel in Seattle with her daughter for a week in case she needed followup treatment. At trial Wilson suggested that MacDonald's injuries were not as severe as she claimed.

Wilson pled *nolo contendere* to assault and received a sentence of six months in jail and four years probation. Riggs was not charged with assault. After the assault, the City of Tenakee Springs initiated a lawsuit against MacDonald to enjoin her from using the motorized wheelbarrow. This suit was eventually settled in favor of MacDonald. MacDonald also obtained a protective order against Riggs.

With respect to the lawsuit resulting in this appeal, MacDonald originally brought claims of assault, battery, false imprisonment, and intentional infliction of emotional distress against Wilson, individually and in his official capacity as Chairman of the Tenakee Springs Legal Research Committee, the City of Tenakee Springs, and Riggs. MacDonald also sued the parties listed above and Mayor Vicki Wisenbaugh, individually and in her official capacity, under 42 U.S.C. § 1983. Riggs counterclaimed for defamation. The City of Tenakee Springs, Vicki Wisenbaugh, and Wilson, in his official capacity only, settled with MacDonald. Since Wilson had pled *nolo contendere* in his criminal case, the superior court granted summary judgment against him on MacDonald's claims of assault and battery. The jury awarded MacDonald $210,720.74 in damages from Wilson as a result of the assault. The jury found for Riggs on the claims against him and awarded him $35,000 in damages from MacDonald for his defamation counterclaim. MacDonald made motions for a directed verdict and JNOV on the defamation counterclaim, both of which were denied. She now appeals the denial of her motion for JNOV.

## III. DISCUSSION

■ When reviewing the denial of a motion for JNOV, our role "is not to weigh conflicting evidence or judge ... the credibility of the witnesses, but is rather to determine whether the evidence, when viewed in the light most favorable to the nonmoving party, is such that reasonable men could not differ as to their judgment."[1]

MacDonald argues that there was no evidence of unprivileged defamatory statements at trial and that even if there were such evidence the statements would be time-barred by the statute of limitations. She also argues that Riggs presented no evidence that he suffered actual harm resulting from the defamatory statements.

### A. Reasonable Jurors Could Find that MacDonald Made Unprivileged Defamatory Statements.

■ MacDonald argues that Riggs "failed to elicit or provide testimony addressing any of the elements necessary to prove a defamation claim." The elements of defamation are "(1) a false and defamatory statement; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) the existence of either 'per se' action ability or special harm."[2] It is also "necessary that the recipient of the defamatory communication understand it as intended to refer to the plaintiff."[3]

There is evidence that MacDonald made unprivileged statements to third parties after the assault that could be construed as defamatory against Riggs. MacDonald testified on direct examination that when she arrived in Tenakee Springs after the attack she told a local resident, Barbara Scanlan, "what happened." On cross-examination by Wilson, MacDonald stated the following:

A ... I sat down in the chair, and ... Barbara Scanlan came out....

Q And did you tell Barb Scanlan ... how you sustained your injuries?

A She asked me what happened to me, and *I told her what happened.*

Q *As you've told us here in court?*

A *Yes.*

---

1. *Holiday Inns of Am., Inc. v. Peck,* 520 P.2d 87, 92 (Alaska 1974); *see also Ben Lomond, Inc. v. Schwartz,* 915 P.2d 632, 635 (Alaska 1996).

2. *French v. Jadon, Inc.,* 911 P.2d 20, 32 (Alaska 1996); *see also* Restatement (Second) of Torts § 558 (1977).

3. Restatement (Second) of Torts § 564 cmt. a (1977).

(Emphasis added.) This testimony viewed in a light most favorable to non-movant Riggs would allow a reasonable jury to infer that MacDonald told Scanlan her version of Riggs's involvement, as she had told it in court. In court MacDonald claimed that Riggs had threatened her with a rifle and forced her back to Wilson's home at gunpoint.[4]

MacDonald's daughter, Cynthia Roman, testified that she was concerned about her mother's safety immediately after returning from Seattle because "neither one of *them* had been arrested. *They* were still out there." (Emphasis added.) When asked about the use of the word "they" on cross-examination, Roman stated "[Riggs] was there." A reasonable jury could infer from this testimony that MacDonald had told her daughter that Riggs threatened her with a rifle and held her captive at gunpoint.[5]

■ There is little question that Mac-Donald's statements implicating Riggs as a participant in the assault were defamatory. A statement "is defamatory if it tends to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."[6] Accusing someone of holding a woman at gunpoint in the aftermath of a vicious attack would qualify as defamatory under this definition.

■ A reasonable jury could also find the elements of falsity and fault. Since the jury found for Riggs, it is evident that it did not believe MacDonald's version of events. With respect to fault, this element is met if a person "knows that the statement is false and that it defames the other."[7] Assuming the story was false, it is unlikely that Mac-Donald would have told the entire story to someone, as it was told in court, without knowledge of the false and defamatory nature of her statements.

■ Thus, a reasonable jury relying on the evidence described above, viewing the evidence in the light most favorable to Riggs, could find that MacDonald knowingly made false and defamatory statements about Riggs. The statements discussed were not made in the course of any judicial proceeding and therefore were not privileged.[8]

---

4. The dissent argues that since MacDonald was answering a question regarding how she had sustained her injuries, it is only possible to infer that she told Scanlan how she sustained her injuries. Dissent at 20. Since Riggs was not involved in physically injuring her, the dissent argues that one cannot infer that she mentioned Riggs to Scanlan. *Id.* at 20. However, Mac-Donald had earlier testified that she told Scanlan "what happened" in response to a question that asked "what happened when you arrived at the store?" The fact that her answers to the two different questions were exactly the same strongly suggests that her second answer should not be read as more limited than her first.

5. The dissent argues that this evidence is insufficient to support the jury verdict. Dissent at 20. While this a close call, the standard of review for a JNOV is deferential. This court will only take the step of overturning a jury's verdict when "the evidence, when viewed in the light most favorable to the nonmoving party, is such that reasonable men could not differ as to their judgment." *Holiday Inns of Am., Inc. v. Peck*, 520 P.2d 87, 92 (Alaska 1974). The reviewing court may look at the evidence and make "reasonable inferences which may be drawn from the evidence." *City of Delta Junction v. Mack Trucks, Inc.*, 670 P.2d 1128, 1130 (Alaska 1983). Here, it is reasonable to draw an inference from MacDonald's testimony that she told other people that Riggs threatened her with a rifle.

6. *Green v. N. Pub. Co.*, 655 P.2d 736, 739 (Alaska 1982) (citing RESTATEMENT (SECOND) OF TORTS § 559 (1977)).

7. RESTATEMENT (SECOND) OF TORTS § 580B. With respect to defamation "concerning a private person, or concerning a public official or public figure in relation to a purely private matter," a person is also liable if they act "in reckless disregard of" or "negligently fail to ascertain" the false and defamatory nature of their statements. *Id.*

8. Statements made in the course of judicial proceedings are protected by the doctrine of absolute privilege. *Lawson v. Helmer*, 77 P.3d 724, 727–28 (Alaska 2003). MacDonald is concerned that the jury based its verdict on privileged statements that she made during and regarding the lawsuit. She states that "[a] potential explanation for the jury's verdict on the defamation counterclaim ... could be that the jury felt that if it found that Mr. Riggs neither assaulted nor falsely imprisoned Judy MacDonald, then it must find that Judy MacDonald's accusations in that regard are defamatory." The fact that Mac-Donald made accusations about Riggs out of court that she later repeated in court would not

## B. Riggs's Counterclaim Relates Back to the Date of MacDonald's Complaint.

MacDonald argues that even if there is evidence of defamation the jury should have been barred from considering it because of the two-year statute of limitations for defamation lawsuits.[9] MacDonald filed her complaint on March 21, 2003, and Riggs filed his answer and counterclaim on April 15, 2003. MacDonald argues that because the statute of limitations on defamation is two years, Riggs was barred from relying on evidence of defamatory statements made prior to April 15, 2001. All of the evidence at trial concerned statements made after the assault occurred on April 2, 2001, but before April 15, 2001. We hold that Riggs's counterclaim should relate back to the date of the complaint.

Much of the Alaska jurisprudence on relation back deals with amendments to pleadings. Civil Rule 15(c) specifies that amendments to pleadings relate back to the date of the original pleading if the claim or defense in the amendments "arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading." Under Rule 15(c) "[a] compulsory counterclaim relates back to the date of a party's answer; a permissive counterclaim does not."[10] This court has not yet dealt with the issue presented here: whether a defendant's counterclaim should relate back to the date the plaintiff filed the complaint. Unlike Civil Rule 15, Civil Rule 13, which addresses counterclaims, does not specify when and if a counterclaim should relate back to the date of the plaintiff's complaint.

Many federal jurisdictions have addressed this question.[11] Most federal courts have elected to toll the statute of limitations for compulsory counterclaims from the date the complaint is filed:

> Although there is some conflict on the subject, the majority view appears to be that the institution of plaintiff's suit tolls or suspends the running of the statute of limitations governing a compulsory counterclaim. This approach precludes plaintiff, when the claim and counterclaim are measured by the same period, from delaying the institution of the action until the statute has almost run on defendant's counterclaim so that it would be barred by

immunize the out-of-court accusations. But as to the in-court accusations, the appropriate method to address potential jury confusion would have been for the court to have issued a jury instruction on privilege. *See* Alaska Civil Pattern Jury Instruction 16.03 (1989 Rev.). However, MacDonald did not object to the jury instructions on defamation or request that a jury instruction on privilege be included, even after raising the issue of privilege in her motion for a directed verdict. Therefore, this issue can only be reviewed for plain error. *Conam Alaska v. Bell Lavalin, Inc.*, 842 P.2d 148, 153 (Alaska 1992). "Plain error will be found when an obvious mistake exists such that the jury instruction creates a high likelihood that the jury will follow an erroneous theory resulting in a miscarriage of justice." *Id.* (quotations omitted). We do not think there is a high likelihood that the jury erred on this issue. No evidence was presented of statements related to the judicial proceedings that were made prior to the trial, and we are confident that the jury understood that making the statements only during the trial would not support a defamation claim. After all, it is relatively easy to figure out that a defamation suit could not be brought on the basis of statements not yet made.

The dissent argues that MacDonald's statements were conditionally privileged. Even if they were, this would not change the outcome. Conditional privilege only shields defendants from liability if they do not abuse the privilege. RESTATEMENT (SECOND) OF TORTS § 599 (1977). Abuse of a conditional privilege occurs when a defendant publishes information that she "knows to be false" or "acts in reckless disregard as to its truth or falsity." *Id.* § 600. Thus, "mere negligence as to falsity ... is [not] treated as sufficient to amount to abuse of a conditional privilege." *Id.* cmt. b. The jury found in answer to a question in the special verdict that MacDonald made defamatory statements regarding Riggs knowing them to be false. She thus abused any conditional privilege that may have existed. Therefore, any error in failing to instruct on conditional privilege was harmless and thus, by definition, not "plain."

9. AS 09.10.070 states that an action for slander must be "commenced within two years of the accrual of the cause of action."

10. *Domke v. Alyeska Pipeline Serv. Co.*, 137 P.3d 295, 301 (Alaska 2006) (citing Alaska R. Civ. P. 13(a), (b) and 15(c); *Mogg v. Nat'l Bank of Alaska*, 846 P.2d 806, 813–14 (Alaska 1993)).

11. Alaska Civil Rule 13 is identical to Federal Rule of Civil Procedure 13.

the time defendant advanced it. Nor is plaintiff apt to be prejudiced by the tolling of the statute, since he presumably has notice at the time he commences his action of any counterclaim arising out of the same transaction as his suit. Moreover, the necessarily close relationship between the timely claim and the untimely counterclaim should insure that the latter is not "stale" in the sense of evidence and witnesses no longer being available; they should be as accessible for adjudicating the counterclaim as they are for the main claim.[12]

We find the majority federal rule to be based on sound policy. Therefore, if Riggs's counterclaim is compulsory, it will relate back to the date of MacDonald's complaint.

 Under Alaska Civil Rule 13(a) a counterclaim is compulsory "if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." When determining whether a counterclaim is based on the same transaction or occurrence we look to such things as whether the claims are logically related; whether they involved the same testimony, parties, and exhibits; whether the facts are related in time, space, and origin; and whether the two claims form a convenient trial unit.[13] Here, both MacDonald's claim and Riggs's counterclaim are closely related to Riggs's involvement in the assault, so they are related in origin. The two claims also involve the same parties and the same exhibits and formed a convenient trial unit. Finally, Riggs's counterclaim was logically related to MacDonald's assault claim. If the jury had found for MacDonald on the assault claim against Riggs, it would not have been able to find for Riggs on the defamation claim since a defendant is not liable for true statements. Therefore, we find that Riggs's counterclaim was compulsory and relates back to the date of MacDonald's complaint and Riggs may recover

for any defamatory statements made by MacDonald after March 21, 2001. Because the assault occurred on April 2, 2001, any defamatory statements regarding his role in the assault would have been made after that date.

### C. JNOV Regarding Damages Was Properly Denied.

 Slander per se includes instances where "the words impute a serious crime to the plaintiff."[14] According to the Restatement (Second) of Torts, such serious crimes include offenses "punishable by imprisonment in a state or federal institution."[15] The defamatory statements in this case involve Riggs threatening MacDonald with a rifle. Alaska Statute 11.41.220(a)(1)(A) defines "assault in the third degree" as "plac[ing] another person in fear of imminent serious physical injury by means of a dangerous instrument." As a class C felony,[16] this is punishable by jail time of "not more than five years."[17] Therefore, Riggs's defamation claim involves slander per se. Slander per se enables a jury to award general damages "for the purpose of compensating the plaintiff for the harm that the publication has caused to his reputation."[18]

 Under Alaska law general damages for defamation per se may be awarded without any proof of damages. In *City of Fairbanks v. Rice*, we noted that the superior court was correct in finding that statements that are defamatory per se "obviat[e] the need for proof of damages."[19] Similarly, in *Alaska Statebank v. Fairco* this court upheld damages for a defamation case involving slander per se on the basis that "[p]roof of actual damages was … not necessary to support the award[ ]."[20]

Even though no proof of actual damages was required given the slander per se char-

---

12. 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1419, at 152–53 (2d ed.1990).

13. *Domke*, 137 P.3d at 301.

14. *French v. Jadon*, 911 P.2d 20, 33 (Alaska 1996).

15. Restatement (Second) of Torts § 571 (1977).

16. AS 11.41.220(d).

17. AS 12.55.125(e).

18. Restatement (Second) of Torts § 621 cmt. a (1977).

19. 20 P.3d 1097, 1107 (Alaska 2000).

20. 674 P.2d 288, 295 (Alaska 1983). In 1974 the United States Supreme Court found the common law rule that allowed a jury to presume damages without proof of injury in defamation cases deal-

acter of Riggs's claim, he did provide evidence of actual injury. Riggs testified that MacDonald "destroyed [his] life." In *Gertz v. Robert Welch, Inc.*, the United States Supreme Court noted that it is appropriate to compensate a defamation plaintiff for such things as "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." [21] MacDonald's defamation occurred in a very small town and involved serious allegations against Riggs. Viewed in this context, Riggs's testimony could enable a reasonable juror to award damages on the basis that MacDonald's statements harmed Riggs's reputation and standing in the community and caused him emotional distress.

The superior court instructed the jury that for Riggs to recover on his claim of defamation the jury had to find that "Riggs incurred actual harm." Since under Alaska law proof of actual damages is not required in cases involving slander per se, this instruction may have been erroneous.[22] But any error would have been favorable to MacDonald and thus may be ignored.

Civil Rule 61 states that "[t]he court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Here, since any error that occurred was favorable to MacDonald, her substantial rights have not been impacted.

We therefore conclude that the superior court correctly denied MacDonald's motion for JNOV regarding damages.

## IV. CONCLUSION

We AFFIRM the superior court's denial of the motion for JNOV because there was sufficient evidence of defamation for a reasonable jury to find for Riggs. The defamatory statements were not time-barred by the statute of limitations because Riggs's counterclaim relates back to the date of MacDonald's complaint. Since the defamatory statements in question were slander per se, Riggs did not have to provide proof of damages, and any error in the jury instructions on damages was harmless.

FABE, Chief Justice, with whom BRYNER, Justice, joins, dissenting.

## I. Introduction

While the standard of review for the denial of a motion for judgment notwithstanding the

---

ing with matters of public concern to violate the First Amendment, "at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In 1985 the Court declined to extend the *Gertz* prohibition on presumed damages to defamatory statements on matters that are not of public concern. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 760-61, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). Since *Dun & Bradstreet* the majority of states, Alaska included, have continued to allow presumed damages in the absence of any proof of harm for statements that are defamatory per se and are not about matters of public concern. *E.g., Liberty Nat. Life Ins. Co. v. Daugherty*, 840 So.2d 152, 157 (Ala.2002); *City of Fairbanks*, 20 P.3d at 1107; *Gaudio v. Griffin Health Servs. Corp.*, 249 Conn. 523, 733 A.2d 197, 215 (1999); *Bryson v. News Am. Publ'ns, Inc.*, 174 Ill.2d 77, 220 Ill.Dec. 195, 672 N.E.2d 1207, 1214 (1996); *Stringer v. Wal–Mart Stores, Inc.*, 151 S.W.3d 781, 795 (Ky.2004); *Costello v. Hardy*, 864 So.2d 129, 140 (La.2004); *Marston v. Newavom*, 629 A.2d 587, 593 (Me.1993); *Foster v. Noel*, 715 So.2d 174, 184 (Miss.1998); *Chowdhry v. NLVH, Inc.*, 109 Nev. 478, 851 P.2d 459, 462 (1993); *Touma v. St. Mary's Bank*, 142 N.H. 762, 712 A.2d 619, 622 (1998); *Constant v. Spartanburg*

*Steel Prods., Inc.*, 316 S.C. 86, 447 S.E.2d 194, 197 (1994). A few states have overturned the traditional rule and require proof of injury in all defamation cases. *United Ins. Co. of Am. v. Murphy*, 331 Ark. 364, 961 S.W.2d 752, 756 (1998); *Gobin v. Globe Pub. Co.*, 232 Kan. 1, 649 P.2d 1239, 1243 (1982); *Nazeri v. Mo. Valley Coll.*, 860 S.W.2d 303, 313 (Mo.1993); *Newberry v. Allied Stores, Inc.*, 108 N.M. 424, 773 P.2d 1231, 1236 (1989). *See generally* David A. Anderson, *Reputation, Compensation and Proof*, 25 Wm. & Mary L.Rev. 747 (1984) (arguing that presumed damages should not be a part of defamation law).

**21.** 418 U.S. 323, 350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *see also* Restatement (Second) of Torts § 621 cmt. a (1977) (noting that general damages can be awarded for emotional distress).

**22.** The court gave the jury a special verdict form on the defamation counterclaim. Question one asked whether MacDonald made defamatory statements regarding Riggs knowing them to be false. Question two asked, "[i]f the answer to question # 1 is 'yes,' then what sum of money, if any, is awarded to Mr. Riggs from Ms. MacDonald as compensatory damages?" The special verdict form was appropriate given the slander per se nature of the defamatory statements.

verdict is a deferential one, I believe the court today strains that deference beyond reason. The court holds that the record supports a finding of defamation per se, yet it identifies no direct testimony that MacDonald made a statement about Riggs, much less a statement that defamed Riggs. Instead, the court infers such a statement based on MacDonald's testimony that she told a neighbor "what happened" mere minutes after the assault and her daughter's oblique references to "they" and "them" in expressing concern for her mother's safety. Neither statement affords a basis from which a jury could reasonably conclude that MacDonald made a defamatory statement, much less a statement that was defamatory per se—a legal category that requires that a statement "be so unambiguous as to be reasonably susceptible of only one interpretation." [1] I therefore respectfully dissent from the court's decision to uphold the denial of a motion for a JNOV. Moreover, the jury's verdict in spite of the lack of evidence is not surprising given the trial court's failure to instruct the jury that privileged statements cannot serve as a basis for defamation liability—a failure that under the circumstances constitutes plain error.

## II. The Record Does Not Support the Jury's Verdict.

In finding a basis for the jury's verdict, the court cites no direct testimony of a defamatory statement, instead relying on inferences from the testimony of MacDonald and her daughter. The court relies on MacDonald's testimony that, upon arriving in town and in search of help, she told Barbara Scanlan "what happened." MacDonald testified that when she arrived in town with "blood ... dripping in [her] face and in [her] mouth," Barbara Scanlan said that she looked awful. MacDonald reported her response: "It is awful." MacDonald then proceeded to tell Scanlan what had happened. At no point during MacDonald's direct testimony did she indicate that this conversation included any mention of Riggs. Nor did she mention Riggs when cross-examined about her statement to Scanlan. To conclude that MacDonald defamed Riggs, the court relies on the following interchange between MacDonald and Wilson during Wilson's cross-examination:

Q. And did you tell Barb Scanlan ... how you sustained your injuries?

A. She asked me what happened to me, and I told her what happened.

Q. As you've told us here in court?

A. Yes.[2]

The court infers from this testimony that MacDonald not only mentioned Riggs to Scanlan, but that she also stated that he brandished a weapon in a manner sufficient to constitute assault. Then, to support a jury verdict with no special damages, the court concludes that this inferred statement, although nowhere laid out in testimony, was defamatory per se—a subcategory of defamation that requires that a statement "be so unambiguous as to be reasonably susceptible of only one interpretation." [3]

Contrary to the inference drawn by the court, this testimony falls far short of supporting a claim that MacDonald made an unambiguous statement defaming Riggs. MacDonald testified that when she told Scanlan how she sustained her injuries, her explanation of those injuries was consistent with her testimony in court. But MacDonald did not testify in court that Riggs injured her. In fact, she testified that she sustained her injuries during Wilson's physical assault. Because Riggs's actions were not related to her injuries, this testimony does not even support a conclusion that MacDonald mentioned Riggs to Scanlan, much less that she defamed him. The only thing that can reasonably be inferred from MacDonald's testimony is that when she told Scanlan how she sustained her injuries, her explanation was consistent with her in-court statements.

---

1. *French v. Jadon, Inc.*, 911 P.2d 20, 32 (Alaska 1996) ("For a publication to be defamatory per se, the words used must be so unambiguous as to be reasonably susceptible of only one interpretation ....") (internal quotations and citations omitted).

2. At 15.

3. *French*, 911 P.2d at 32.

A second statement cited by the court also fails to support the denial of MacDonald's motion for a JNOV. The court quotes the testimony of MacDonald's daughter, Cynthia Roman, that she was concerned about her mother's safety because "neither one of *them* had been arrested. *They* were still out there." [4] The court concludes that these indirect references, coupled with Roman's statement on cross-examination that "[Riggs] was there," [5] support a finding of defamation per se.

I simply cannot agree that these vague statements support a conclusion that MacDonald made an unambiguous statement to Roman defaming Riggs. In fact, the testimony does not even allude to any statements by MacDonald—defamatory or not. And contrary to the court's assumption, it is not a foregone conclusion that because Roman testified that she feared for her mother's safety, MacDonald must have told her that Riggs assaulted her. In fact, Riggs was present at the scene, and it is eminently reasonable for a daughter to fear someone who was present at the scene of a vicious attack on her mother. And Roman testified that she was concerned about her mother's safety even before the attack, stating, "I had been in Tenakee the week before [the assault], and I had insisted she go to the [Village Public Safety Officer] with me because I feared for her safety." When asked to explain her concern, Roman testified that she had been informed by a young man in town "that Merle and Riggs have tape recorders and they're running around and they're saying they're going to do something." Roman also testified that she had read letters from Riggs to her mother "threatening to burn her house, threatening to poison her dogs." In sum, Roman's testimony provided ample support for her fear without MacDonald having told Roman anything about Riggs's actions on the day of the attack. The court's inference that MacDonald must have told Roman that Riggs assaulted her is simply not justifiable when Roman had so many independent reasons to fear for her mother's safety around Riggs— including his presence at the scene of a vicious attack on her mother, his threatening letters, and a warning from a young man in town. Because the record lacks support for a finding of defamation, much less defamation per se, I would reverse the superior court's denial of MacDonald's motion for a JNOV.

## III. It Was Plain Error Not To Instruct the Jury on Privilege.

Given the lack of evidence of any statement by MacDonald about Riggs, one might wonder how the jury arrived at a verdict of defamation. The jury's verdict can be explained by the trial court's failure to explain the boundaries of privilege to the jury. As a result, the jury was unaware that it could not legally base its verdict on MacDonald's testimony in court. Because the need for such an instruction was obvious and its omission very likely affected the jury's verdict, the court's failure to instruct the jury on privilege amounts to plain error and would require reversal even if MacDonald had not moved for a JNOV.

Although the court correctly notes that MacDonald did not object to the jury instructions,[6] this does not preclude our review of the issue for plain error.[7] "Plain error exists where there is an obvious mistake that creates 'a high likelihood that the jury will follow an erroneous theory resulting in a miscarriage of justice.'" [8] The court's failure to instruct the jury on the boundaries of privilege in this case was an obvious mistake. The clear rule in Alaska is that witness testimony is absolutely privileged. Over thirty years ago we adopted the "virtually unanimous" position of legal authorities "that defamatory testimony by a witness in a judicial

---

4. At 15–16.

5. *Id.*

6. At 16–17 n. 8.

7. *Shields v. Cape Fox Corp.*, 42 P.3d 1083, 1087 (Alaska 2002) (holding that trial court's failure to instruct on comparative fault was plain error requiring reversal).

8. *Id.* (quoting *Alaska Marine Pilots v. Hendsch*, 950 P.2d 98, 110 (Alaska 1997)).

proceeding ... is absolutely privileged."[9] And one element of any defamation claim is an *unprivileged* publication. In a case such as this one, without any direct evidence of statements other than those made in the course of judicial proceedings, it was an obvious error not to instruct the jury on the boundaries of privilege.

I am fortified in this conclusion by the fact that, in addition to the absolute privilege that undoubtedly protects MacDonald's trial testimony, conditional privilege likely protects one of the statements on which the court today relies. We have previously recognized a conditional privilege for speech on matters of public safety.[10] Thus, any statement MacDonald made to Scanlan upon her arrival in town—mere minutes after she was assaulted and her skull was fractured—may be protected by this conditional privilege. Even assuming MacDonald had mentioned Riggs to Scanlan, and even if she had stated that Riggs had a gun—two statements that are not reflected in the record—both statements advance MacDonald's interest in her own safety and that of her community.[11] Public policy supports the view that a crime victim seeking help mere minutes after an assault occurred should not be concerned about liability. Moreover, information about whether any of the assailants had a weapon is undoubtedly critical to law enforcement personnel who may respond to the situation.

The trial court's failure to instruct the jury on the issue of privilege very likely allowed the jury to reach a verdict based on an erroneous theory.[12] In the absence of any direct evidence of a defamatory statement by MacDonald, the jury's verdict strongly suggests that it considered MacDonald's testimony in reaching its verdict. As a result, it is highly likely that the trial court's failure to instruct the jury on the boundaries of privilege affected the outcome of the case.

Because the trial court's failure to instruct the jury on the boundaries of privilege very likely affected the verdict in this case, and the only inference supported by the record is the inference that the jury must have mistakenly considered privileged statements in returning a verdict of defamation, I respectfully dissent from the court's opinion.

**9.** *Nizinski v. Currington*, 517 P.2d 754, 756 (Alaska 1974); *see also Gilbert v. Sperbeck*, 126 P.3d 1057, 1059 (Alaska 2005); *Lawson v. Helmer*, 77 P.3d 724, 727 (Alaska 2003).

**10.** *Taranto v. N. Slope Borough*, 992 P.2d 1111, 1115 (Alaska 1999); *see also DeNardo v. Bax*, 147 P.3d 672, 678–79 (Alaska 2006) (holding that conditional privilege protected worker who told her coworkers about threats).

**11.** Of course, the conditional privilege can be lost where the speaker acts with malice. But malice is a higher standard of fault than that required for a claim of defamation of a private figure. Moreover, "evidence of ill will alone is not sufficient to establish abuse of the privilege." *DeNardo*, 147 P.3d at 681. Finally, the determination whether the conditional privilege is lost is generally a factual question for the jury. We cannot conclude as a matter of law that MacDonald knew that Riggs did not have a gun. MacDonald testified that she heard Wilson yell at Riggs to bring a gun. This statement occurred

during an assault in which Wilson fractured MacDonald's skull. Under the circumstances, the jury could conclude that MacDonald was mistaken but that she did not know her statement was false.

**12.** In reaching its conclusion that MacDonald abused any conditional privilege, the court relies on the jury's affirmative answer to a special verdict question that asked: "Did Ms. MacDonald make defamatory statements regarding Jack Riggs knowing them to be false?" But the elements instruction provided to the jury differed from the special verdict question, and, in fact, the instructions allowed the jury to find liability if MacDonald "reasonably should have known" that her statements were false. As a result, the jury could have based its special verdict answer on a finding that MacDonald was negligent in failing to recognize that her statements were false—a finding not sufficient to establish abuse of a conditional privilege. Thus, the trial court's failure to instruct the jury on privilege cannot be deemed harmless error.