Craig LIGHTLE, Appellant,

v.

STATE of Alaska, REAL ESTATE
COMMISSION, Appellee.

No. S–11719.

Supreme Court of Alaska.

Oct. 20, 2006.

Hugh G. Wade, Wade, Kelly & Sullivan, Anchorage, for Appellant.

Karen L. Hawkins, Assistant Attorney General, Anchorage, David W. Márquez, Attorney General, Juneau, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

BRYNER, Chief Justice.

## I. INTRODUCTION

Arlene Seeley made an offer to buy a home but withdrew her offer after learning that the seller had accepted it only as a back-up offer: an offer that would be accepted only if a previously accepted offer fell through. Seeley then filed a claim with the Alaska Real Estate Commission, alleging that Craig Lightle, the home's listing agent, had fraudulently misrepresented the home's status by leading her to believe that the home was immediately and unconditionally available. After holding a hearing on the claim, the commission ruled in Seeley's favor and imposed sanctions against Lightle. On appeal, Lightle insists that the evidence fails to support the commission's finding of intentional misrepresentation. But the record contains substantial evidence that Lightle misrepresented the home's availability by inaccurately describing the home in the Anchorage Multiple Listing Service as an "active listing"; by prematurely telling Seeley that the originally accepted offer had been rescinded; and by incorrectly assuring Seeley that her own offer had been accepted and that "the house is yours." Because the record also contains substantial evidence that Lightle knew these representations to be untrue or unfounded when he made them yet intended or expected that Seeley would rely on them, we conclude that the record supports the commission's finding of a fraudulent misrepresentation.

## II. FACTS AND PROCEEDINGS

In early 1998 Craig Lightle, a real estate agent with Realty Executives Alaska, listed a residential property in Anchorage for sale on behalf of the Leighs. On April 17 the Williamses offered to buy the house. The Leighs accepted the offer. The Williamses had trouble securing a loan: their application was initially denied. Sometime before June 5, the bank notified Lightle that it had denied the loan. Meanwhile, the Williamses evidently decided to seek other sources for financing.

Lightle nevertheless re-listed the property on the Multiple Listing Service as an active listing, with a note stating "previous pending offer, buyer unable to qualify for loan." In early June 1998 Arlene Seeley—represented by real estate agent Cheryl Ponder—saw the house and became interested in making an offer. On Friday, June 5, Ponder called Lightle on Seeley's behalf to discuss the home. During this conversation Lightle told Ponder that the home was "available." Although Lightle acknowledged that a prior offer had been made and accepted, he insisted the deal was "dead." According to Ponder, either during this June 5 conversation or their next conversation on June 8, Lightle told Ponder that a rescission agreement had been sent to him, but that it had not yet been received. At the end of the June 5 conversation, Lightle informed Ponder that he planned to be out of town but that Ponder could call his associate if she wanted to prepare an offer. Ponder then contacted Seeley and told her the house was for sale and active. Based on this information, Seeley decided that she wanted to make an offer to buy the Leighs' home. Later the same day, Ponder contacted Lightle's associate, who said that she should send Seeley's offer by fax and that he "would get it and take care of it." Ponder then sent Seeley's offer of $120,000, together with a proposed earnest money agreement and a $500 earnest money deposit.

On June 8, after the weekend, Lightle called Ponder to communicate the Leighs' counteroffer of $124,000. After consulting with Ponder, Seeley decided to send Lightle a counteroffer for $122,000. Ponder trans-

mitted the counteroffer, and Lightle called Ponder back later that day to tell her Seeley's $122,000 counteroffer had been accepted by the Leighs. Seeley was present in Ponder's office when Lightle called, and listened on Ponder's speaker-phone. During the conversation Lightle assured Seeley that the house was hers, and said that the sellers would return to Anchorage to sign the agreement on Friday, June 12. Based on her understanding that she "had the house," Seeley canceled her existing lease, rented a U-haul, and began switching her utilities over.

Soon after the June 8 conversation, however, Lightle learned that the Williamses still wanted the house and were trying to arrange a different loan. On June 12 Lightle sent Ponder a copy of Seeley's proposed earnest money agreement that had been signed by the Leighs. But the agreement's wording had been changed to incorporate a new "Back-up Addendum," which purported to accept Seeley's offer only as a back-up to the Williamses' still-pending offer.

Upon learning of these changes, Seeley refused to accept the agreement. After obtaining a rescission of her earnest money offer and a refund of her deposit,[1] Seeley filed a claim against the Alaska Real Estate Commission's real estate surety fund, a state-administered fund created by statute to compensate individuals who suffer loss in real estate transactions due to fraud.[2] She alleged that Lightle had engaged in fraudulent misrepresentation and that his actions had caused her to suffer damages by prompting her to cancel her existing lease.

Lightle disputed these allegations, and the commission appointed a hearing officer to hear Seeley's claim. Lightle, Seeley, and Ponder testified at the hearing. The hearing officer issued a written decision, concluding that Lightle had committed fraudulent misrepresentation by telling Seeley that the Leighs' house was available, without disclosing that the Williamses previously accepted offer had not yet been rescinded. The decision specifically found that Lightle's misrepresentations were intentional and material to the real estate transaction. It recommended an award of damages to compensate Seeley for the losses she incurred by prematurely canceling her lease; it also recommended suspending Lightle's real estate license. The commission adopted the hearing officer's decision and its recommendations.

Lightle appealed to the superior court, which affirmed the commission's decision.[3] Lightle then filed this appeal, contending that the evidence fails to support a finding of intentional misrepresentation.

## III. STANDARD OF REVIEW

▬ When the superior court acts as an intermediate appellate court in an administrative appeal, we review the agency's actions directly.[4] We review issues of law de novo, but use the substantial evidence test to review an agency's factual findings.[5] Substantial evidence to support an agency's findings exists when there is " 'such relevant evidence as a reasonable mind might accept as adequate to support the conclusion.' "[6] In deciding whether this standard has been met, "we view the record in the light most favorable to upholding the trial court's ruling."[7] It is not our job to reweigh the evidence or choose

---

1. The Williamses eventually failed in their efforts to secure another loan and rescinded their agreement with the Leighs on June 24, 1998—well after Seeley had withdrawn her offer. The Leighs ultimately sold their home to another buyer, and Realty Executives Alaska received a commission as joint agent for buyer and seller.

2. *See* AS 08.88.450; AS 08.88.460.

3. For reasons not relevant here, the superior court also directed the commission to reduce the amount of damages awarded to Seeley.

4. *Treacy v. Municipality of Anchorage*, 91 P.3d 252, 260 (Alaska 2004); *Halliburton Energy Servs. v. State, Dep't of Labor*, 2 P.3d 41, 44 n. 1

(Alaska 2000) (citing *Univ. of Alaska v. Univ. of Alaska Classified Employees Ass'n*, 952 P.2d 1182, 1184 n. 6 (Alaska 1998)).

5. *Treacy*, 91 P.3d at 260 (citation omitted).

6. *Yoon v. Alaska Real Estate Comm'n*, 17 P.3d 779, 782 (Alaska 2001) (quoting *Balough v. Fairbanks N. Star Borough*, 995 P.2d 245, 254 (Alaska 2000)).

7. *Stumbaugh v. State*, 599 P.2d 166, 172–73 n. 15 (Alaska 1979).

between competing inferences; we only determine whether substantial evidence supports the agency's factual findings.[8] Findings of misrepresentation involve issues of fact.[9]

## IV. DISCUSSION

Seeley brought her claim under AS 08.88.460, which allows claims to be brought against the real estate surety fund by "a person seeking reimbursement for a loss suffered in a real estate transaction as a result of fraud, misrepresentation, [or] deceit."[10] Lightle argues that the record fails to support the commission's finding that he made intentional misrepresentations to Seeley. Lightle insists that there is no evidence showing that he made any statement of fact *"with the knowledge that it was false and with the intent to deceive."* (Emphasis in original.) At most, Lightle contends, his statements regarding the availability of the house were "expressions of expectation and predictions of future events," rather than declaratory statements of fact. According to Lightle, "there was no evidence that he ever said that there was no pending offer." Moreover, Lightle asserts, his statements were not actually false when he made them, since he expected that the Williamses would rescind their agreement—and ultimately, they did just that.

■ But Lightle inaccurately describes the elements necessary to prove a fraudulent misrepresentation; specifically, he is mistaken in suggesting that those elements require proof of a specific intent to deceive. Alaska follows the Restatement (Second) of Torts on what constitutes an intentional or fraudulent misrepresentation.[11] As described in the Restatement, the elements of fraudulent mis-

representation are: (1) a misrepresentation of fact or intention, (2) made fraudulently (that is, with "scienter"), (3) for the purpose or with the expectation of inducing another to act in reliance, (4) with justifiable reliance by the recipient, (5) causing loss.[12]

Lightle concentrates his challenge on the elements that require proof of fraud and intent. He concedes that Seeley "did reasonably rely upon Craig Lightle's assurance" and does not contest that Seeley's reliance caused her to suffer damages.

■ Section 525 of the Restatement sets out the general rule imposing liability for fraudulent misrepresentation as follows:

One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.[13]

■ As used in the Restatement, the word "fraudulent" refers "solely to the maker's knowledge of the untrue character of his representation. This element of the defendant's conduct frequently is called 'scienter.'"[14] Under Section 526 of the Restatement,

[a] misrepresentation is fraudulent if the maker

(a) knows or believes that the matter is not as he represents it to be,

(b) does not have the confidence in the accuracy of his representation that he states or implies, or

---

8. *Storrs v. State Med. Bd.,* 664 P.2d 547, 554 (Alaska 1983).

9. *See Yoon,* 17 P.3d at 782 (whether there was promissory fraud "is primarily a question of fact and based on credibility determinations"); *see also Wirum & Cash, Architects v. Cash,* 837 P.2d 692 (Alaska 1992).

10. AS 08.88.460(a).

11. *E.g., City of Fairbanks v. Amoco Chemical Co.,* 952 P.2d 1173, 1176 n. 4 (Alaska 1998); *Barber v. National Bank of Alaska,* 815 P.2d 857, 862

(Alaska 1991) (citing RESTATEMENT (SECOND) OF TORTS § 525 (1977)); *Carter v. Hoblit,* 755 P.2d 1084, 1086–87 (Alaska 1988) (relying on Restatement).

12. RESTATEMENT (SECOND) OF TORTS §§ 525, 526, 531 (1977).

13. *Id.* § 525.

14. *Id.* § 526 cmt. a.

(c) knows that he does not have the basis for his representation that he states or implies.[15]

To be "fraudulent," then, a representation need only be made with "scienter," in other words, the necessary "knowledge of the untrue character." [16] But not all fraudulent misrepresentations are actionable under the Restatement's definition:

In order that a misrepresentation even though fraudulently made, may be actionable, it is necessary that the other conditions stated in § 525 exist[,] . . . namely, the maker's purpose to induce the recipient to act in reliance upon the misrepresentation[.] [17]

The Restatement defines this requirement of a "purpose to induce" action as follows:

One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends *or has reason to expect to act or to refrain from action in reliance upon the misrepresentation,* for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.[18]

As can be seen, this provision does not require the maker of a false statement to act with the specific "intent to deceive"; rather, it requires the maker to have reason to expect that the other's conduct will be influenced.

With this framework in mind, we turn to the record to determine whether the evidence supports the commission's finding of fraudulent misrepresentation. In our view, the record contains substantial evidence that would, if believed, allow reasonable persons to find several interrelated misrepresentations.

It is undisputed that sometime in May or early June 1998, Lightle re-listed the property in the Multiple Listing Service as an "active listing," with a note stating "previous pending offer, buyer unable to qualify for loan." It is also undisputed that Seeley relied on this listing when she submitted her first offer to Lightle on June 5. Yet according to Ponder, Lightle's description of the property as an "active listing" amounted to a false statement of fact.

Specifically, Ponder testified that, "according to MLS guidelines when a property is in [the] computer as active, it is for sale. It is not pending or contingent. They have—they have pending and contingency, you can put them in there that way." Lightle offered no testimony or other evidence to rebut Ponder's assertions, so it was not unreasonable for the hearing officer to find that they were credible.

Nor was it unreasonable for the hearing officer to infer that Lightle knew that it was inaccurate and misleading to give the house an "active" listing. Nothing in the record suggests that the original offerors, the Williamses, intended to rescind their offer before June 12, 1998, or that they said anything to Lightle suggesting that they had such an intent after learning that their first loan application had fallen through. Nor does the record contain any evidence suggesting that, after learning that the first application was rejected, Lightle had any basis for concluding that the Williamses had actually abandoned their efforts to make good on their offer. To the contrary the Williamses persisted in attempting to obtain adequate funding and did not rescind their offer until June 24.

■ Thus, when he relisted the property as active, Lightle lacked any basis to believe that the Williamses actually had rescinded, as the active listing specifically suggested; instead, he evidently surmised that they probably *would* rescind. And it is uncontested that no rescission agreement was actually signed until well after the property was listed.

---

**15.** *Id.; see Anchorage Chrysler Ctr., Inc. v. DaimlerChrysler Corp.,* 129 P.3d 905, 914 (Alaska 2006).

**16.** Restatement (Second) of Torts § 526 cmt. a (1977).

**17.** *Id.* § 526 cmt. b.

**18.** *Id.* § 531 (emphasis added).

Moreover, Ponder also testified that Lightle told her on June 5 that the house was available and that "the first offer was dead." On June 5 or 8 Lightle told Ponder that a rescission of the previously accepted offer was being sent to him. Specifically, Ponder testified that "Craig [Lightle] said that the rescission was coming" and that "it had been signed by his seller, and he assured us it would be back." Ponder further testified that Lightle indicated that the rescission agreement's arrival was "imminent." And according to Ponder, she—and, by implication, Seeley—relied on Lightle's assurances.

Seeley, who listened to the conversation between Lightle and Ponder on Ponder's speaker-phone, confirmed Ponder's testimony, insisting that Lightle said "the sellers had accepted [her counter] offer." The hearing officer found that both Ponder and Seeley were "credible witnesses," while noting that Lightle's testimony was "noteworthy both for what he said, and for what he did not say."

When viewed in the light most favorable to Seeley, this evidence supports a finding that Lightle knowingly made false statements of fact by telling Ponder and Seeley that a rescission agreement had been signed and that "the house is yours." And as previously mentioned, Lightle does not contest that Seeley reasonably relied on these assurances.

Finally, the evidence at the hearing included further testimony by Ponder describing misleading assurances by Lightle that Seeley's $122,000 counteroffer had been accepted. As already noted, Lightle had listed the property in the Multiple Listing Service as an active listing. Ponder testified that this meant that the property had no other pending offers. Referring to Lightle's June 8 conversation with Ponder, Seeley confirmed that "Craig said over the speaker phone that the sellers accepted the offer and that they would be flying in on Friday, I believe, was the 12th of June, to sign paperwork." And according to Ponder, Lightle told her and Seeley that "yep, the house is yours, not selling it to anybody else, the sellers would

not let—did not want him to fax it, they would sign it when they got there." Ponder also testified that, "we were never told we were in a back-up position."

Ponder's testimony was corroborated by her contemporaneous notes of the June 8 conversation. Ponder wrote that she and Seeley made the counteroffer of $122,000, and

> Craig call[ed] us right back and said Seller accepted the counter. He ask[ed] for lenders phone [number] because seller "anxious" as the home previously sold by Remax [ ]and Buyer did not qualify I gave lenders phone [number]. Craig said seller would [not] sign until she arrives on Friday, did not have a fax and "don't worry" property is sold to Arlene [Seeley].…

By Lightle's own account, he learned sometime soon after June 8 that the Williamses were still interested in the house. On June 15 Lightle sent Ponder and Seeley a copy of Seeley's $122,000 earnest money offer that the Leighs had just signed. Yet this copy had been changed to include a new " 'Back-up' Addendum to [the] Earnest Money Receipt and Agreement to Purchase," which conditioned the Leighs' acceptance of Seeley's offer on the Williamses' failing to close the still pending original offer. Seeley immediately refused to accept this new term. And the Williamses did not rescind their original offer until June 24, well after Seeley withdrew.

On appeal, Lightle takes the position that, as far as he knew, his June 8 statements were literally true when he made them: "The evidence strongly suggests that from June 5th through June 8th, Craig Lightle reasonably believed that the Williams' offer was 'dead,' in the sense that it was not going to culminate in a sale of the Leigh property." But this theory is legally flawed because it ignores that, even if literally true in the limited sense suggested by Lightle, his June 8 statements would amount to misrepresentations by half-truth.

■ As we initially recognized in *Carter v. Hoblit*[19] and more recently held in *Anchor-*

---

**19.** *See Carter,* 755 P.2d at 1086–87 (citing with approval RESTATEMENT (SECOND) OF TORTS § 529 (1977)).

*age Chrysler Center, Inc. v. DaimlerChrysler Corp.,*

a statement can be literally true and yet still be an actionable misrepresentation. Section 529 of the Restatement (Second) of Torts says: "A representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent misrepresentation." Under this standard, a partial disclosure is fraudulent if "the person making the statement knows or believes that the undisclosed facts might affect the recipient's conduct in the transaction in hand." The Restatement gives some examples, including a prospectus that fails to list all the company's debts; a statement that a title to land has been upheld by a particular court without mentioning that the court's decision has been appealed; and a statement that tenants in a building all pay a certain rent, without mentioning that the rent is still subject to approval by a rent control agency.[20]

Lightle's June 8 statements are closely analogous to the Restatement's illustrations of fraudulent misrepresentations by half-truths: by assuring Ponder that the prior deal "is dead," that Seeley's offer had been accepted, and that "the house is yours"—all without any mention of the fact that the Williamses' previously accepted offer had not yet been rescinded and still technically remained in effect—Lightle made a partial disclosure that failed to reveal facts that "might [have] affect[ed] the recipient's conduct in the transaction in hand." [21]

And despite Lightle's arguments to the contrary, substantial evidence supports the finding that Lightle's partial disclosure was fraudulent—that is, that Lightle "[did] not have the confidence in the accuracy of his representation[s] that he state[d] or implie[d]"; [22] that he "[knew] that he [did] not have the basis for his representation[s] that

he state[d] or implie[d]"; [23] and that "he intend[ed] or ha[d] reason to expect" that Seeley would "act . . . in reliance upon the misrepresentation." [24]

Because the Restatement standard requires nothing more to establish an intentional misrepresentation, we hold that the evidence supports the commission's findings and conclusions.

## V. CONCLUSION

For these reasons, we AFFIRM the superior court's ruling upholding the commission's decision.

**20.** *Anchorage Chrysler Ctr., Inc.,* 129 P.3d at 915 (citations omitted) (quoting and citing RESTATEMENT (SECOND) OF TORTS §§ 529, 529 cmt. b, 529 cmt. a, illus. 2 (1977)).

**21.** RESTATEMENT (SECOND) OF TORTS § 529 cmt. b (1977).

**22.** *Id.* § 526.

**23.** *Id.*

**24.** *Id.* § 531.