Martha L. ASHER, Appellant,

v.

ALKAN SHELTER, LLC., Appellee.

No. S–12464.

Supreme Court of Alaska.

July 31, 2009.

---

John C. Pharr, Law Offices of John C. Pharr, Anchorage, for Appellant.

Zane D. Wilson, Cook Schuhmann & Groseclose, Inc., Fairbanks, for Appellee.

Before: FABE, Chief Justice, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

An employer sued a former employee and his ex-wife for damages it incurred when the employee embezzled a substantial sum from the employer. The ex-wife now appeals that portion of the judgment rendered against her, arguing that the court's findings are insufficiently specific for appellate review, that the complaint did not plead fraud with sufficient particularity, that the court should not have allowed amendment of the complaint, and that it was error to impose joint and several liability. Concluding that the court did not err in any of the first three areas, we affirm the trial court's determination that the ex-wife is liable for fraud. But because it was error to impose joint and several liability, and because the trial court did not have jurisdiction when it attempted later to amend the judgment, we reverse the damages award and remand the matter to the trial court for reassessment of both compensatory and punitive damages.

## II. FACTS AND PROCEEDINGS

### A. Facts

Mitch and Martha Asher married in 1995 and divorced in 2002 in Florida. In February 2003 Mitch moved to Fairbanks to work for Alkan Shelter, LLC (Alkan) as its chief financial officer. He worked there until November 2003. During that time he stole about $104,000 from Alkan. The court found Martha was involved in three fraudulent transactions, described below.

#### 1. Health insurance

Mitch enrolled Martha on Alkan's health insurance by lying and saying they were married. Martha claimed she did not know about the fraud, and that she paid Mitch $100 per month for the insurance. The trial court did not believe her, and found that she knew Mitch got her insurance by fraud. The court found the health insurance cost Alkan Shelter $3,457, which the court found to be "part of the money embezzled by Mitchell Asher."

#### 2. House purchase

While Mitch was in Fairbanks, Martha bought a house there. Martha claimed Mitch loaned her some money for the purchase, and she paid him back. The trial court did not believe her. The court found that Mitch actually had a financial interest in the house, even though it was in Martha's name. The trial court found that Mitch put about $11,000 embezzled from Alkan into the house, and that Mitch and Martha put the house in her name in order to keep Alkan from getting its money back. Mitch testified that he expected to get about $30,000 when Martha sold the house, but that she refused to pay him that money. The trial court believed Mitch.

#### 3. Fraudulent affidavit

When Alkan first sued Mitch and Martha, its complaint alleged the house Martha bought was really Mitch's, and should be "available" to pay Alkan back for the money Mitch embezzled. With the complaint, Alkan filed a *lis pendens* on the house. Although it

appears this *lis pendens* had no legal effect relevant to this case,[1] everyone, including the trial court, assumed that the *lis pendens* gave Alkan a security interest in the house against its claim for damages.

In order to get Alkan to release the *lis pendens,* which she thought was a lien, Martha gave Alkan an affidavit. The affidavit provided:

> 1. I did not have any knowledge, nor did I receive the proceeds of any theft by Mitchell Asher from Alkan Shelter LLC.
> 2. I am the sole and exclusive owner of the property identified in the lis pendens filed by Alkan Shelter LLC (hereinafter the property).
> 3. The funds used to purchase the property were solely and exclusively my money and Mitchell Asher had no concealed interest in these funds. I did not purchase the property for Mitchell Asher and Mitchell Asher had no legal or equitable interest in the property.

Alkan then released the *lis pendens.*

The trial court found that Martha lied in this affidavit in order to "defraud Alkan Shelter by hiding money [Mitch] stole from Alkan Shelter, that Alkan Shelter at that point in the litigation reasonably relied on the representation and dismissed the lis pendens voluntarily, and suffered the lack of those funds being secured and available to settle claims for this litigation." The court made this finding by clear and convincing evidence, and wrote: "The court also finds by clear and convincing evidence that Martha Asher was recklessly indifferent to the rights of Alkan Shelter and the conduct by Martha Asher was outrageous in nature."

### B. Proceedings

In February 2004 Alkan sued Mitch and Martha for damages. The complaint alleged that Mitch embezzled money from Alkan. It alleged that the house

> belongs to defendant Mitchell Asher, but has fraudulently been placed in the name of Martha Liliana Asher for the purpose of avoiding creditors and making the defendant Mitchell Asher judgment proof. . . .

---

1. *See infra* Part IV.E.2.

Defendant Mitchell Asher is the true owner of the above-referenced described (sic) real estate and said real estate should be available to pay for the thefts by defendant Mitchell Asher from Alkan Shelter.... Funds embezzled from Alkan Shelter, LLC were used to purchase, or have been invested in, the above-referenced real estate and as such, plaintiff's interest in those funds should be traced into that real estate.

Finally, the complaint alleged that Mitch and Martha's actions were "criminal, outrageous and extreme, such that an award of punitive damages should be entered against them."

With the complaint, Alkan filed the *lis pendens* described above. After Martha gave Alkan the affidavit described above, Alkan released the *lis pendens*.

In June 2004 Mitch confessed judgment to Alkan for $105,830.

In October 2004 Alkan amended its complaint to allege that Martha committed fraud by lying in her affidavit to induce Alkan to release the *lis pendens* on the house.

Mitch having confessed judgment, trial began against Martha in June 2006 before Superior Court Judge Pro Tem Raymond M. Funk. At the time, Mitch was in federal prison, and therefore testified by deposition. At her own request, Martha participated telephonically from Florida. In his oral findings at the end of trial, Judge Funk noted: "[I] find[ ] this one of the strangest trials I've ever done in eight years on the bench in that everything turned on the credibility of two people that the court never saw."

At trial, Alkan presented, and Martha contested, a great deal of evidence about the authenticity of Mitch and Martha's divorce, and prior instances of fraud and theft by Mitch of which Martha was aware. Judge Funk found, in this regard, that Martha "previously knew he was a thief in many situations."

Alkan's complaint did not mention Martha's health insurance,[2] and only alleged

Mitch embezzled from Alkan. But one of Alkan's witnesses testified about Martha's health insurance twice, and Martha testified about it once. After both sides had presented their witnesses, Alkan moved to amend its complaint to allege that "Mitchell and Martha ... stole health insurance from Alkan Shelter for her benefit, and she received that benefit either knowingly or with reckless disregard for it being stolen." Alkan moved to amend under Civil Rule 15(b), which allows amendment of the complaint to conform to the evidence presented at trial. Martha opposed the motion, but the trial court granted it.

The court made oral findings. After the trial, Martha moved for additional, more specific findings under Civil Rule 52. The court then entered written findings of fact and conclusions of law. The court entered judgment against Mitch for $101,080.37, making Martha jointly and severably liable with Mitch for $33,457 of that total. The court also awarded $5,000 in punitive damages against Martha.

Martha appealed that judgment, and also objected in the superior court to joint and several liability. The trial court agreed that joint and severable liability was inappropriate, and instead allocated fault between Mitch (seventy-five percent) and Martha (twenty-five percent) and calculated Alkan's loss at an even $104,000. The court then entered an amended final judgment, making Martha individually liable for $29,872.75 (twenty-five percent of $104,000, plus prejudgment interest). The trial court again awarded $5,000 in punitive damages against Martha.

## III. STANDARD OF REVIEW

When a trial court hears a case without a jury, we review the trial court's findings of fact for clear error.[3] A finding of fact is clearly erroneous if it leaves us with the definite and firm conviction on the entire record that the trial court made a mistake.[4] We review the trial court's application of the

---

**2.** *See supra* Part II.A.1.

**3.** *Cousineau v. Walker*, 613 P.2d 608, 612 (Alaska 1980).

**4.** *Id.*

law to the facts *de novo*.[5] We review a trial court's decision to allow amendment of the pleadings for abuse of discretion.[6] We treat the trial court's allocation of comparative fault as a question of fact, and therefore review it for clear error.[7] "We will overturn an award of punitive damages entered by a court sitting as the trier of fact only if it is manifestly unreasonable, the result of passion or prejudice, or entered in disregard of rules of law."[8] We review issues not raised in the trial court for plain error.[9]

## IV. DISCUSSION

### A. Alkan Pled Fraud with Sufficient Particularity.

■ Martha argues Alkan did not plead its cause of action for fraud with sufficient specificity. Alaska Civil Rule 9(b) requires that "in all averments of fraud ..., the circumstances constituting fraud or mistake shall be stated with particularity." This standard is not high. Civil Rule 9(b) "simply requires a claim of fraud to specify the time and place where the fraud occurred; it seeks to prevent conclusory pleading by requiring a complaint to do more than 'recit[e] without specificity that fraud existed,' but it does not prevent plaintiffs from filing complaints based on available information and belief."[10]

■ Alkan's complaint met Civil Rule 9(b)'s requirement. It alleged how and when Mitch embezzled from Alkan: "In his capacity as a financial officer and controller, defen-

dant Mitchell Asher embezzled funds from the plaintiff." The complaint then described the property Martha bought, and alleged that the property "belongs to defendant Mitchell Asher, but has fraudulently been placed in the name of Martha Liliana Asher for the purpose of avoiding creditors and making the defendant Mitchell Asher judgment proof.... Funds embezzled from Alkan Shelter, LLC were used to purchase, or have been invested in, the above-referenced real estate." Alkan's complaint then alleged that Martha "represented under oath that Mitchell Asher had no interest, legal or equitable, in the above referenced real estate ... when in fact Mitchell Asher did have an interest in the above described real estate.... Through the use of the above fraudulent testimony and documents, Martha Liliana Asher convinced Alkan Shelter LLC to release its lis pendens on the property." These allegations set forth facts supporting all five elements of fraud.[11] They are sufficient to meet the standard in Civil Rule 9(b).

### B. The Trial Court Did Not Abuse Its Discretion in Granting Alkan's Motion To Amend Its Complaint.

Martha argues that the trial court abused its discretion by allowing Alkan to amend its complaint under Alaska Civil Rule 15(b) to conform to the evidence about Martha's health insurance at the end of trial.[12] We disagree.

---

**5.** *Rausch v. Devine*, 80 P.3d 733, 737 (Alaska 2003).

**6.** *Alderman v. Iditarod Props.*, 32 P.3d 373, 380 (Alaska 2001).

**7.** *S. Alaska Carpenters Health & Sec. Trust Fund v. Jones*, 177 P.3d 844, 858 (Alaska 2008).

**8.** *Mapco Express, Inc. v. Faulk*, 24 P.3d 531, 536 (Alaska 2001) (quoting *Pluid v. B.K.*, 948 P.2d 981 (Alaska 1997)). *See also Alaska Statebank v. Fairco*, 674 P.2d 288, 296 (Alaska 1983).

**9.** *Owen M. v. State, Office of Children's Servs.*, 120 P.3d 201, 203 (Alaska 2005).

**10.** *Williams v. Engen*, 80 P.3d 745, 750 (Alaska 2003) (alteration in original) (citations omitted) (quoting *Law Offices of Vincent Vitale v. Tabbytite*, 942 P.2d 1141, 1147 (Alaska 1997)). As an example of a conclusory pleading, *see D.J. Moore Corp. v. Cook Inlet Region, Inc.*, 1992 WL

12549796, *1 (Alaska May 6, 1992) (holding fraud insufficiently pled where complaint alleged only that defendant "worked a fraud upon" plaintiff).

**11.** *See infra* text accompanying notes 21.

**12.** In her reply brief, Martha extensively quotes from *Heustess v. Kelley-Heustess*, in which we held that the court violated a husband's due process rights by awarding the wife child support for the years before they were married when it came up for the first time on rebuttal, and the husband "lacked notice and an opportunity to be heard on this issue." 158 P.3d 827, 835 (Alaska 2007). Ironically, Martha brings up this due process argument for the first time in her reply brief, and we decline to address it. *Heustess* does not discuss Alaska Civil Rule 15.

■ Amendment of the pleadings under Civil Rule 15(b) is appropriate (1) with the opposing party's express or implied consent, or (2) in certain circumstances over the opposing party's objection that the evidence is not within the issues raised by the pleadings.[13] In this case Martha did not object to the evidence when Alkan offered it, and therefore situation (2) does not apply. Martha did not expressly consent to try the matter of the health insurance, so the question becomes whether Martha impliedly consented to try the matter.

Alkan's complaint does not allege that Martha embezzled or stole anything from Alkan directly, it only alleges she hid funds Mitch embezzled in the house. But at trial Alkan presented evidence about the health insurance three times, and Martha responded on the merits. First, Alkan called Diane Pederson, the accountant who untangled Alkan's finances after Mitch left, about Mitch's embezzlement. Alkan asked Ms. Pederson to "give us an emphasis on, did Martha Asher receive benefits, funds, tickets, anything … directly from Alkan Shelter?" In response, Ms. Pederson described the health insurance.

Later, Alkan questioned Martha about the health insurance on direct examination. Rather than objecting, Martha responded on the merits, stating that she did not know Mitch got the insurance by fraud. She claimed he told her the insurance was "group insurance," (i.e., came through a group plan) and that she paid him $100 a month for it. She said she was not suspicious about the source of the health insurance because such group plans are "not uncommon" in Miami. She claimed to be on such a group plan, not through her work, at the time of trial for $134 a month. When Alkan's lawyer asked why she had not produced evidence of the payments to Mitch, she responded "I didn't submit anything because you didn't ask me about it." Finally, after Martha presented her case, Alkan called Ms. Pederson again. She testified briefly that Alkan paid $3,457 for Martha's health insurance. Again, Martha did not object.

■ We have held that when both parties address the substantive merits of an issue at trial, the parties have impliedly consented to try it.[14] Alkan introduced evidence that Mitch obtained medical coverage for Martha through his employment. Although mere failure to object to the introduction of evidence potentially relating to a new claim does not amount to implied consent to try that claim,[15] in this case Martha not only failed to object to the evidence, she countered it on the merits.[16] Martha argues that the trial court abused its discretion because the amendment prejudiced her, and that "had she known about [the amendment] sooner, she could have defended by proving that she paid Mr. Asher $100 a month for health insurance." But prejudice is only one relevant factor in determining implied consent,[17] and we find other considerations outweigh any slight prejudice in this case. Although we have found that a party did not impliedly consent to try an issue on which it presented no evidence,[18] Martha presented evidence on the matter. Thus, where Alkan directly questioned Martha and Martha directly testified on the matter, and Martha did not object to Alkan's witness testifying on it twice, Martha impliedly agreed to try the matter.

### C. The Trial Court's Findings Are Sufficiently Specific for Review by This Court.

■ Martha argues that the trial court's fact findings are insufficient for us to review

13. Alaska R. Civ. P. 15(b).

14. *Oaksmith v. Brusich*, 774 P.2d 191, 199 (Alaska 1989).

15. *Belluomini v. Fred Meyer of Alaska, Inc.*, 993 P.2d 1009, 1015–16 (Alaska 1999).

16. *See Tufco v. Pacific Envtl. Corp.*, 113 P.3d 668, 673 (Alaska 2005) (finding no abuse of discretion in denial of motion to amend pleadings under Rule 15(b) where the opposing party objected to

the introduction of evidence relevant to the proposed amendment, and the parties did not litigate the substantive issues of the proposed amendment).

17. *Alderman v. Iditarod Props.*, 32 P.3d 373, 396 (Alaska 2001).

18. *Id.*

them. We have held sufficiently detailed findings are critical to appellate review.[19] The elements of fraud, as discussed below,[20] are (1) misrepresentation, (2) made fraudulently, (3) for the purpose of inducing another to act in reliance on it; and (4) justifiable reliance by the recipient, (5) causing loss.[21] The trial court appears to have found these elements met in each of the three incidents on which it based liability: the health insurance, Martha's affidavit, and the house purchase.

█ Concerning the health insurance,[22] the trial court found that (1) Mitch misrepresented that he and Martha were married, and Martha ratified his misrepresentation by knowingly accepting the benefit of it;[23] (2) Mitch and Martha knew she was not his wife; (3) Mitch and Martha made the misrepresentation to induce Alkan to pay for health insurance for her; (4) Alkan justifiably relied on the misrepresentation; and (5) as a result, Alkan paid for her health insurance. These findings are sufficient to allow appellate review.

█ Concerning Martha's affidavit, the court found that (1) Martha misrepresented that the house belonged solely to her, (2) knowing Mitch had an interest in it, (3) in order to get Alkan to release its *lis pendens* on the house, (4) Alkan justifiably relied on her affidavit, and (5) suffered damages by releasing its *lis pendens* and losing its claim on the house. Again, these findings are sufficient.

Concerning the house purchase, we need not separately consider the trial court's findings because when Martha gave Alkan her fraudulent affidavit, she became liable for fraud to the extent of Mitch's interest in the house that she concealed from Alkan.

Thus, the trial court's findings and conclusions adequately demonstrate the legal and factual grounds for its conclusion.

## D. The Trial Court's Credibility Findings Are Not Clearly Erroneous.

Martha argues that, although normally this court accepts a trial court's assessment of credibility, this case is different because Mitch testified by deposition and Martha by telephone. Martha argues we should not defer to the trial court because the trial court did not have its usual opportunity to evaluate witness credibility. Martha points out that the trial judge mentioned how strange it was to make a credibility determination about two people he never saw. Martha also points out that even though everyone testified that Mitch is a dishonest person, the court believed everything he said about Martha.

██ Alaska Civil Rule 52(a) instructs appellate courts to give "due regard ... to the opportunity of the trial court to judge the credibility of the witnesses." Civil Rule 99 authorizes courts to allow a party to participate in proceedings telephonically. As Martha herself requested to participate telephonically, we decline to credit the argument she now makes that we should reject the trial court's findings on that basis. In any event, a trial court is in a much better position to evaluate a party's credibility when the party testifies live over the telephone, than we are able to evaluate it from a transcript later. We find no clear error in the trial court's credibility determination on this basis.[24]

19. *See Hanlon v. Hanlon,* 871 P.2d 229, 233 (Alaska 1994) ("To permit meaningful appellate review, the trial court must provide sufficiently detailed and explicit findings to give this court a clear understanding of the basis of the trial court's decision, and to enable it to determine the ground on which the trial court reached its decision.") (internal citations and quotation marks omitted).

20. *See infra* Part IV.E.

21. *Lightle v. State, Real Estate Comm'n,* 146 P.3d 980, 983 (Alaska 2006).

22. Even though Alkan's amendment appeared to state a claim for embezzlement of the insurance, the trial court found Martha liable on a fraud theory.

23. *See infra* Part IV.E.1.

24. Martha also objects to the trial court's finding that "Martha Asher portrayed herself as an innocent dupe, an immigrant who miraculously went from waitress to wealthy successful real estate broker but who was unaware of what Mitchell Asher was doing. The court found her testimony incredible." We agree with Martha that her status as an immigrant, should not reflect on her

As for Mitch's deposition testimony, although we generally use a "broader" standard of review for testimony presented to the trial court as a transcript,[25] we conclude the trial court did not err in finding him credible. Mitch's testimony addressed only one issue relevant to this appeal. Mitch did not testify regarding the health insurance. His only testimony relevant to Martha's liability concerned his ownership interest in the house.[26] He testified that he, not Martha, was the true owner of the house, and that they put the house in Martha's name to protect it from his creditors, particularly the IRS. Other evidence presented at trial corroborated this testimony that he had an ownership interest in the house.[27]

Martha also argues that the trial court erred in believing Mitch's testimony that he expected to get about $30,000 at the sale of the house, but that Martha refused to pay that money to him. Martha claims that Mitch's explanation of the $30,000 figure "does not make any sense," but we disagree. Mitch testified:

> The 30,000, if you'd like to know how that number was computed, was roughly the $11,000 down payment ... roughly the $18,000 capital gain between the $151,000

purchase price, and the $169,000 sales price.... That would have brought the total to $29,000, plus I had been paying her approximately $1,500 a month in mortgage payments that had reduced my loan balance to her to approximately 135,000. So there was a $5,000 gain on the loan that she had put up the cash for. So if you take the $11,000, plus the 18 is 29, plus 5 is 34,000. There were some disbursements made at closing to a lady who helped sell the house, and some other expenses that would have brought the net due to me down to approximately $30,000.

Martha argues that Mitch's "computation of the $30,000 figure is not possible. When the house was bought, how could they have know its sale would net $18,000?" But we disagree with Martha's interpretation of this testimony: that Mitch and Martha agreed when buying the house that Mitch would get $30,000 at the sale. The trial court could have reasonably interpreted this testimony to reflect calculations made after the sale; indeed, that is the more likely interpretation. We conclude that the trial court committed no error in accepting Mitch's own description of his ownership interest in the house.

credibility, but the trial court's mention of Martha's immigrant status related only to Martha's own attempted characterization of herself as ignorant. Martha mentioned her status as an immigrant once at the trial, as did Alkan, completely in passing. But throughout the trial, Martha claimed ignorance of straight-forward matters when it would help her case, while at other times appearing savvy and well-informed. There is no clear error in the trial court's finding Martha's claims of ignorance disingenuous.

25. See State v. Phillips, 470 P.2d 266, 268 (Alaska 1970) ("[W]here the trial judge's findings are based on nondemeanor sources, such as documentary evidence, deposition testimony, or transcribed testimony, our scope of review is broader than under the clearly erroneous standard.").

26. As discussed below, we conclude that the relevant fact in this appeal is whether Mitch had an interest in the house. See infra Part IV.E.2. If so, Martha became liable for fraud when she gave Alkan the fraudulent affidavit, and her intent in purchasing the house is irrelevant. For this reason we also do not reach Martha's argument that the trial court erred in finding a "conspiracy" between Mitch and Martha at the time of the house purchase.

27. In addition to Mitch's deposition testimony, Alkan presented other evidence and testimony at trial corroborating this statement. Gerald Myers, Alkan's manager, testified that Mitch told him that he (Mitch) had outstanding IRS claims against him. Mitch told him that he and Martha divorced in order to hide assets from the IRS. Mr. Myers also testified that Mitch told him that he (Mitch) intended to buy a house. Mr. Myers testified that Mitch asked him to come look at the house and give him an opinion on it. Mr. Myers recommended an engineer to Mitch to do a full inspection. Mr. Myers testified that Martha was not in town at that time, and that he never met her. The trial court saw exhibits demonstrating that Mitch made earnest money and down payments on the house. Alkan also called Traci Schachle, the realtor who sold the house to Martha. She testified that she understood that "Martha was purchasing it for Mitch because he was staying here with their son." She testified that she contacted both Mitch and Martha throughout the purchase process. The court also saw the engineer's report, which was addressed to both Mitch and Martha Asher.

### E. The Trial Court's Fraud Findings Are Not Clearly Erroneous.

On appeal, Martha argues that the trial court erred in finding her liable for fraud because its fact findings failed to satisfy all of the elements for fraud. We consider her arguments as they relate to two incidents—the health insurance, and the fraudulent affidavit—and find it unnecessary to analyze separately the third-the house purchase.

The elements of fraudulent misrepresentation [28] are (1) misrepresentation of fact or intention, (2) made fraudulently, (3) for the purpose or with the expectation of inducing another to act in reliance; and (4) justifiable reliance by the recipient, (5) causing loss.[29] A representation is fraudulent if the maker knows it is untrue.[30] A statement can be literally true and still be a fraudulent misrepresentation if the maker knows the statement is materially misleading.[31]

### 1. The health insurance

Martha's broad challenges do not specifically address her health insurance, and we see no reason to disagree with the trial court on this matter. The trial court found that Martha knew Mitch lied on his insurance forms to get Alkan to pay for her insurance. Although Martha herself made no misrepresentation, we agree with the trial court that Martha may be liable for this misrepresentation by knowingly accepting the benefits of Mitch's misrepresentations.[32] Thus, Mitch fraudulently misrepresented that he and Martha were married in order to get Alkan to pay for health insurance for Martha, Martha ratified that misrepresentation by knowingly accepting the benefits of it, Alkan justifiably relied on that misrepresentation, and suffered damages of $3,457.

### 2. The fraudulent affidavit

The circumstances surrounding Martha's fraudulent affidavit met all the elements of fraud: Martha misrepresented that Mitch had no interest in the house; she did so knowing her affidavit was untrue; she executed the affidavit with the intent of inducing Alkan to release its *lis pendens* on the house; and Alkan justifiably relied on the affidavit;[33] released its *lis pendens*; and suffered damages by losing its claim on the house. The final element of damages here is somewhat troubling, because Alkan's *lis pendens* had no legal effect.[34] However, as Mar-

---

**28.** The trial court referred only to "fraud" in its findings. Alaska also recognizes the tort of fraudulent conveyance when one party conveys property to another in order to hide it from creditors. *See Summers v. Hagen*, 852 P.2d 1165, 1169–70 (Alaska 1993). The elements for fraudulent conveyance are: (1) an unlawful agreement; (2) specific intent of each participant in the scheme to hinder, delay and defraud a creditor of one who participated in the scheme; (3) acts taken pursuant to the unlawful agreement; and (4) damages caused by those acts. *Id.* The parties have analyzed this case under the tort of fraudulent representation; we do so as well.

**29.** *Lightle v. State, Real Estate Comm'n*, 146 P.3d 980, 983 (Alaska 2006).

**30.** *Id.*

**31.** *Id.* at 986. Alkan does not dispute that it was literally true that the house was in Martha's name alone.

**32.** *See McClung v. Watt*, 190 Cal. 155, 211 P. 17, 20 (1922) ("[T]he rule generally is that one who accepts the fruits of a fraud, with knowledge of the misrepresentations or concealment by which the fraud was perpetrated, thereby inferentially ratifies the fraud complained of and will be liable therefor, even though he did not personally participate in the fraud...."); *Bransom v. Standard Hardware, Inc.*, 874 S.W.2d 919, 924–25 (Tex. App.1994) (concluding that, although "[a] party ... may become liable by mere silent acquiescence and partaking of the benefits of the fraud," evidence insufficient that husband knew wife had embezzled money to hold husband liable for wife's fraud).

**33.** Martha argues in her brief that Alkan was not justified in relying on her affidavit: "[Alkan] released its lis pendens, through counsel, with its sophisticated eyes wide open." We see no merit in this argument. Alkan was justified in believing Martha's sworn statement whether or not it had a lawyer.

**34.** AS 09.45.940 describes a *lis pendens:* "In an action affecting the title to or the right of possession of real property, the plaintiff ... may record ... a notice of the pendency of the action.... From the time of recording the notice, a purchaser, holder of a contract or option to purchase, or encumbrancer of the property affected has constructive notice of the pendency of the action...." We strictly construe this statute. *Blake v. Gilbert*, 702 P.2d 631, 643 (Alaska 1985) *overruled on other grounds* in *Bibo v. Jeffrey's*

tha did not argue below that the *lis pendens* had no legal effect, reversal on those grounds is not available to her.[35] Ultimately, since both parties and the trial judge treated the *lis pendens* as though it legitimately created a lien on the house, it apparently had substantial practical effect, even if no legal effect.

When Martha gave Alkan this affidavit, she became liable for fraud to the extent of Mitch's interest in the house that she concealed from Alkan. This is true regardless of whether or not she committed fraud when she originally purchased the house in her name. Even if she did not know Alkan claimed to be Mitch's creditor at the time she purchased the house, she certainly knew after Alkan sued her. Thus, we need not consider whether or not Martha committed fraud when she purchased the house. Because Martha is liable for fraud for her affidavit, it is unnecessary to consider whether she is additionally liable for her earlier actions in concealing Mitch's interest in the house.[36]

### F. It Was Error To Impose Joint and Several Liability.

The trial court first imposed joint and several liability, and then changed its damages theory to allocation of fault when it no longer had jurisdiction over this case. Although the trial court was correct that it should allocate fault rather than impose joint and several liability, it also committed clear error in its allocation of fault.

At first the trial court found Mitch liable for the approximately $104,000 he stole from Alkan, and made Martha jointly and severably liable for $33,457 of that amount. That number represented the $30,000 that Mitch expected to get out of the sale of the house and the $3,457 for Martha's health insurance. Martha appealed, but also subsequently objected to joint and several liability in the superior court. The superior court then changed its damages theory, and instead made Martha twenty-five percent liable for the full $104,000 Mitch stole ($29,872.75).

■ When Martha filed her notice of appeal, the trial court lost jurisdiction over the matter. Alaska Appellate Rule 203 gives "supervision and control of the proceedings" to the appellate court from the filing of the notice of appeal. Absent an express remand order, the superior court cannot then modify any "matters directly or necessarily involved in the matter under review," although the superior court retains jurisdiction over collateral matters.[37] We proceed to analyze the superior court's alternative damages award, however, to provide guidance to the court on remand.

As the trial court ultimately concluded, Alaska no longer uses joint and several liabil-

---

Rest., 770 P.2d 290 (Alaska 1989). A *lis pendens* is only appropriate in cases disputing title or physical possession of real property. *Id.* We have previously found *lis pendens* inappropriate where the litigation sought damages for breach of fiduciary duty and breach of contract, even though the complaint demanded an accounting of all defendant's ill-gotten gains that might be traced to the property on which the plaintiff filed a *lis pendens. Id.* In that case we held that "a lien which results merely from an ultimate entry of a judgment provides no basis for filing of a lis pendens notice." *Id.* We also cited with approval a California case holding a *lis pendens* inappropriate where the plaintiff alleged fraudulent misrepresentation and sought a constructive trust in property in which defendant allegedly invested the profits from the tort. *Id.* (citing *Brownlee v. Vang,* 206 Cal.App.2d 814, 24 Cal. Rptr. 158 (1962)).

35. *See Great W. Sav. Bank v. George W. Easley Co.,* 778 P.2d 569, 579 (Alaska 1989) ("It is noteworthy that appellant does not contend that

equitable estoppel will not support a claim for affirmative relief. The general rule is to that effect.... Both parties appear to have treated equitable estoppel as equivalent to a misrepresentation theory. Although this may have been error, it was not raised in the trial court and is not raised on appeal. It is thus not grounds for reversing the judgment in this case.") (internal citations omitted).

36. Although Martha argues the trial court clearly erred in believing Mitch's claim that he expected to realize $30,000 out of the sale of the house, she does not argue that Alkan should be limited to recovering the $11,000 of Alkan's money Mitch put into the house. Therefore we do not consider whether $11,000 would be a more appropriate measure of Alkan's damages from releasing the *lis pendens* than the $30,000.

37. *Heppinstall v. Darnall Kemna & Co.,* 851 P.2d 78, 79 (Alaska 1993) (quoting 4 Am.Jur.2d. *Appeal and Error* § 355, at 834 (1962) ).

ity in tort cases like this one.[38] Thus, the first damages award was erroneous. The trial court correctly concluded that it should allocate damages between those at fault. However, the trial court overlooked two legal requirements in allocating damages. First, it failed to consider the factors required by statute when calculating the percentage of damages allocated to Martha. Second, it found Martha partially liable for the full amount Mitch stole, when its findings support liability for Martha only as to her health insurance and her fraudulent affidavit.

Alaska Statute 09.17.080 requires a court allocating damages to consider "both the nature of the conduct of each person at fault, and the extent of the causal relation between the conduct and the damages claimed." There is no indication in the record that the trial court considered these factors. In fact, there is no indication at all how the trial court arrived at the twenty-five percent figure. On remand the trial court must consider those factors.

▪ Next, the trial court allocated fault to Martha for the full amount that Mitch stole, although Alkan never alleged, and the court never found, that Martha was involved in Mitch's embezzlement other than the insurance and the funds that Mitch hid in the house.[39] A trial court can allocate fault only in "actions involving the fault of more than one person."[40] The only matters the trial court found that involved the fault of both Mitch and Martha were the insurance and the hidden house funds. As to these matters, the court must allocate fault in assessing damages. Thus, the trial court should

have allocated fault to Martha only on the damages related to the health insurance and the house, not the entire amount Mitch stole.

▪ Martha argues, for the first time on appeal, that the trial court should also have allocated fault to Alkan when it allocated fault between Mitch and Martha. We review arguments not made in the trial court for plain error.[41] "Plain error exists where an obvious mistake has been made which creates a high likelihood that injustice has resulted."[42] To determine whether there was plain error, we start with consideration of the governing statute, AS 09.17.080:

> In all actions involving fault of more than one person ... the court, unless otherwise agreed by all parties, shall instruct the jury to answer special interrogatories or, if there is no jury, shall make findings indicating ... (2) the percentage of the total fault that is allocated to each claimant [and] defendant....

In *Domke v. Alyeska Pipeline Service Co.*, we discussed allocation of fault where, as is the case here, the cause of action has a justification element.[43] In that case, the cause of action was tortious interference with a third party's contract, which requires the interference be unjustified.[44] We reasoned that if the plaintiff had been at fault, the defendant's interference in the contract would have been justified.[45] "The definition of the cause of action does not allow a finding that the harm [the defendant] caused was partly justified."[46]

▪ Similarly, a successful fraudulent misrepresentation claim requires the plaintiff

---

38. *See* AS 09.17.080; *Robinson v. Alaska Props.*, 878 F.Supp. 1318, 1322 (D.Alaska 1995) ("Under current Alaska law, joint and several liability is abolished and the plaintiff may recover from each potential tortfeasor who is joined as a party, only in the proportion that his fault bears to her total damages.").

39. In its oral findings, the court said: "The court did not find by a preponderance that there was a larger scheme, although there might've been. And beyond the house and the medical insurance, it appears that Martha Asher may have benefited from money stolen from Alkan Shelter and spent on her while she traveled to Alaska; however, the court has insufficient evidence to clearly determine an amount for that."

40. AS 09.17.080.

41. *Owen M. v. State, Office of Children's Servs.*, 120 P.3d 201, 203 (Alaska 2005).

42. *Id.* (quoting *D.J. v. P.C.*, 36 P.3d 663, 667–68 (Alaska 2001)).

43. 137 P.3d 295, 305–07 (Alaska 2006).

44. *Id.* at 306.

45. *Id.* at 306–07.

46. *Id.* at 306.

show it was justified in relying on the defendants' misrepresentations. If Alkan were at fault in trusting Mitch and Martha, then it would not have been justified in relying on their fraudulent misrepresentations. Thus, when the trial court found Martha liable for fraud, it impliedly found that Alkan was not at fault in relying on Martha's misrepresentations. Therefore, we conclude that in this case the trial court did not plainly err in failing to allocate damages to the plaintiff as well as the defendants.

### G. Although the Trial Court Did Not Clearly Err in Its Punitive Damages Award Against Martha, We Remand the Punitive Damages Award in Light of Our Remand Concerning Compensatory Damages.

Martha argues that the trial court erred in imposing punitive damages against her because it did not make its findings by clear and convincing evidence. We conclude that, because the evidence presented at trial in support of punitive damages was clear and convincing, the trial court did not clearly err in awarding punitive damages.[47]

 We find no error because, despite the court's initial oral statement suggesting that it might have awarded punitive damages on the basis of a preponderance of the evidence, it made abundantly clear in its written decision that it based its punitive damages

ruling on the correct standard, "clear and convincing evidence." And the evidence presented was clear and convincing. On the fraudulent affidavit, for example, Martha's only defense was that she told the truth, and that Mitch did not have an ownership interest in the house. But Alkan produced substantial evidence that Mitch did have an ownership interest in the house, including Mitch's deposition, the testimony of Mr. Myers and the realtor who sold the house, and documents related to the transaction.[48] Thus, the trial court had a sufficient basis to make this finding by clear and convincing evidence.[49]

 Nonetheless, we must remand the award of punitive damages for two reasons. First, as discussed above, the compensatory damages issue will have to be revisited by the trial court on remand.[50] The proportionality between compensatory damages and punitive damages is one factor to consider when awarding punitive damages,[51] and therefore the trial court should have the opportunity to adjust the punitive damages award to fit any new compensatory damages award, should it choose to do so.[52]

Second, the trial court did not explain how it arrived at the $5,000 amount. Alaska Statute 09.17.020(c) instructs a court to hold a separate proceeding to determine the amount of punitive damages it will award.[53] At such a proceeding, the statute instructs that

---

**47.** Martha correctly points out that in its oral ruling the trial court made somewhat contradictory statements about the standard of proof. The court initially stated: "[B]ased on a preponderance of the evidence standard, the court makes the following findings." But when it issued its written ruling, the court clarified that it was using the proper standard for an award of punitive damages: "The court having orally ruled that there was more than preponderance and less than proof beyond a reasonable doubt clarifies its oral ruling and makes this finding by clear and convincing evidence."

Martha also argues that Alkan did not present a claim for punitive damages to the trial court, but we disagree. Although Alkan only said the words "punitive damages" once during the trial, it requested punitive damages in its complaint, and presented evidence relevant to punitive damages, such as Martha's motives, at trial.

**48.** *See supra* note 27.

**49.** Martha does not argue the court's findings do not amount to "outrageous" or "recklessly indif-

ferent" conduct, which is the standard to be proven by clear and convincing evidence. AS 09.17.020(b). Therefore we do not consider whether the conduct found by clear and convincing evidence meets that standard.

**50.** *See supra* Part IV.F.

**51.** *See Ben Lomond, Inc. v. Campbell,* 691 P.2d 1042, 1048 (Alaska 1984).

**52.** Alkan defended the award of punitive damages, in part, on the grounds that it was "modest." If the trial court finds Martha twenty-five percent liable for $33,457, she will be individually liable for $8,364.25, which makes the punitive damages award appear much less modest, in comparison.

**53.** The trial court did not hold such a separate proceeding in this case, but Martha does not argue this was error.

the fact finder may consider (1) the likelihood at the time of the conduct that serious harm would arise from the defendant's conduct; (2) the degree of the defendant's awareness of the likelihood described in (1) of this subsection; (3) the amount of financial gain the defendant gained or expected to gain as a result of the defendant's conduct; (4) the duration of the conduct and any intentional concealment of the conduct; (5) the attitude and conduct of the defendant upon discovery of the conduct; (6) the financial condition of the defendant; and (7) the total deterrence of other damages and punishment imposed on the defendant as a result of the conduct, including compensatory and punitive damages awards to persons in situations similar to those of the plaintiff and the severity of the criminal penalties to which the defendant has been or may be subjected.

On remand, the trial court must consider any applicable factors listed in AS 09.17.020(c) in reaching its decision on punitive damages.

## V. CONCLUSION

In conclusion, we uphold Martha's liability, but REVERSE the damages awarded against her and REMAND for recalculation of those damages in accordance with this opinion.

MATTHEWS, Justice, not participating.